UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, Defendants.

In re APPLICATION XIV OF THE IN-DEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Dec. 27, 1990.

Charles M. Carberry, Investigations Officer of the Intern. Broth. of Teamsters, New York City (Robert W. Gaffey, of counsel), for defendants.

Sipser, Weinstock, Harper & Dorn, New York City (Susan Martin, Seth Kupferberg, Richard Dorn, of counsel), for Mario Salvatore.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiffs United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The remedial provisions in the Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the remedial provisions, an Investigations Officer to bring charges against corrupt IBT members, and an Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

Application XIV presents for this Court's review the opinion of the Independent Administrator deciding the disciplinary charges brought by the Investigations Officer against IBT officer Mario Salvatore, *Investigations Officer v. Mario J. Salvatore* (the "Salvatore decision"), attached to this opinion as exhibit 1. The Independent Administrator concluded that the Investigations Officer had met his burden and established just cause to sustain the second of two charges filed against Salvatore. The Independent Administrator imposed a two-year suspension from office and IBT membership on Salvatore. This application followed.

For reasons to be discussed, the opinion of the Independent Administrator's is affirmed in all respects.

*I. Background*

Mario Salvatore is the Secretary–Treasurer of IBT Local 191, located in Bridgeport, Connecticut. The Secretary–Treasurer is the principal executive officer of that local. Salvatore assumed this post on January 1, 1990. Between December 31, 1989, and July, 1987, Salvatore was a Business Agent for Local 191, although not a member of its General Executive Board. Prior to July, 1987, Salvatore was the president of Local 191, and a member of its general executive board.

The Investigations Officer brought two charges against Salvatore. First, Salvatore was charged with violating Article II, § 2(b) of the IBT Constitution, his IBT membership oath not to bring reproach upon the union. The charge specifically alleged that Salvatore "[e]mbezzled monies from the Teamsters Local 191 Health Services and Insurance Plan." The factual basis of this charge was Salvatore's plea of guilty to a violation of 29 U.S.C. § 1131 contained in a substitute information, ("aiding and abetting the willful failure to keep and maintain accurate and complete plan records"). This offense was a reduced charge to the charges against Salvatore in his criminal indictment *United States of America v. Anthony G. Rossetti, et al.,* Cr. No. N–86–30 (PCD) (D.Conn.). The Independent Administrator found that the Investigations Officer had not demonstrated just cause that this charge was proved.

The second charge ("charge II") filed against Salvatore alleged that he violated Article II, § 2(a), the membership oath, and Article XIX, § 6(b) of the IBT Constitution, by "failing to perform [his] duties as a union officer and embezzling and converting to [his] own use and the use of another

union funds." [1] In sum, charge II alleges that Salvatore participated in a scheme to "improperly funnel union monies under the disguise of severance and other improper benefits" to members of the Local 191 GEB then under indictment. The Independent Administrator found that the Investigations Officer had demonstrated just cause that this charge had been proved.

The following background is relevant to charge II. On June, 27, 1986, three officers of Local 191, Salvatore, the President, Rossetti, the Secretary–Treasurer, and Roberto, the Recording Secretary, were indicted in *United States of America v. Anthony G. Rossetti, et al.,* Cr. No. N–86–30 (PCD) (D.Conn.). That indictment charged Salvatore with embezzling $5000 from a Local 191 health fund. On May 22, 1987, Salvatore entered into a plea agreement, and pled guilty to a reduced charge of aiding and abetting the willful failure to keep and maintain accurate plan records. Salvatore entered his plea on July 14, 1987.

A Local 191 membership meeting was held on July 12, 1986, the purpose of which was to "inform the membership" about the indictment against Salvatore, Roberto and Rossetti. All three indicted officers proclaimed their innocence to the membership in attendance.

At a Local 191 executive board meeting held August 9, 1986, a $100 per week pay raise for Rossetti was approved. Salvatore voted for the raise and made no mention of the pending indictment against Rossetti. At that meeting, Rossetti approved a raise for all employees of Local 191, including Salvatore. These raises were never disclosed to the membership, nor reported in the minutes of the August 9, 1986 meeting.

At a nomination meeting held on September 6, 1986, Salvatore, Rossetti, and Roberto engaged in a round-robin series of nominations, nominating and seconding each

---

1. The language of charge II tracks that of the criminal statute contained in the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 501(c). That statute provides as follows:

 "Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the monies, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for more than five years, or both."

other for their posts. Salvatore, Rossetti, and Roberto were all re-elected to their posts unopposed.

At a meeting of Local 191's executive board held on December 20, 1986, Rossetti was given another raise of $100 per week. The other members of the executive board were given $50 per week raises. All these raises were effective January 1, 1987. Officers of Local 191 were normally given raises only once a year. In December of 1986, Rossetti purchased a new 1987 Cadillac with Local 191 funds for $31,669.00.

Neither the raises nor the purchase of the Cadillac Eldorado were reported to the membership of Local 191. At a membership meeting held on January 18, 1987, Rossetti discussed the upcoming trial. Neither Rossetti nor Salvatore disclosed the second round of pay raises or the purchase of the car.

On April 4, 1987, Rossetti called a special membership meeting. Rossetti was absent because he was meeting with his attorney. Salvatore chaired this meeting. Salvatore told the membership he was innocent of the charges against him and looked forward to his trial. At this same time, however, Salvatore was already seeking to negotiate his plea with the Government.

At that same April 4, 1987 meeting, a resolution was passed stating that "any paid officer forced to leave the job other than by loss of an election shall be entitled to one week severance for each year of service." With the passage of the two pay increases in 1986, Salvatore, Rossetti and Roberto would each be eligible to receive additional compensation should they be forced to leave their posts because of the criminal charges outstanding against them.

In addition, at the April 4, 1987 meeting, a resolution was passed reaffirming that "any officer with either nine years of service or three consecutive terms" could purchase the union car assigned for his use for one dollar. Salvatore, Rossetti and Roberto all would have qualified to purchase cars under the terms of that provision.

The result of this series of pay raises and the automobile purchase resolution was that Salvatore, Rossetti, and Roberto all would be eligible to receive significant compensation should they be forced to leave their union posts as a part of any penalties resulting from the pending indictment. The final portion of the severance resolutions was put in place at that same April 4, 1987 meeting.

On April 10, 1987, six days after passage of severance pay schedule and the reaffirmance of the automobile purchase resolution, Rossetti agreed to plead guilty in his criminal case. Rossetti was sentenced to two year's imprisonment, suspended after three months, three months probation, restitution to the plan in the amount of $24,-000, and was barred from holding union office for eight years. On May 12, 1987, Local 191 paid Rossetti $33,000 severance, and $11,000 in accrued vacation pay. These payments were in accordance with the April 4, 1987 resolution, and made with Salvatore's knowledge. On the date of Rossetti's resignation, June 8, 1987, Rossetti purchased his six-month old 1987 Cadillac Eldorado from Local 191 for $1.

At his disciplinary hearing before the Independent Administrator, Salvatore admitted that the severance motions passed at the meetings were not "proper," and that the "notice of the special meeting did not adequately inform the members that there would be a vote on a car and severance pay." (Record at 159). Salvatore also testified that his motivation for passing these resolutions was that "I was worried about myself individually" and "my own concern was me." (Record at 128–29).

## II. Discussion

Salvatore argues that the decision of the Independent Administrator was arbitrary and capricious because (1) he applied the wrong standard in evaluating the charges; (2) the evidence failed to establish charge II; (3) charge II was barred by collateral estoppel and res judicata; (4) charge II was barred because the membership knew generally of the allegations against Salvatore; (5) the penalty was unduly harsh; and (6) Salvatore is not bound by the Consent De-

cree. All of these objects are without merit and must be dismissed.

█ It is well-settled that with respect to the disciplinary and investigatory provisions of the Consent Decree, the IBT General President and GEB delegated their disciplinary authority under the IBT constitution to the Court Officers. *United States v. International Brotherhood of Teamsters*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion and Order, 743 F.Supp. 155, 159–60 (S.D.N.Y.1990); November 2, 1989 Memorandum and Order, 725 F.Supp. 162, 169 (S.D.N.Y.1989); January 17, 1990 Memorandum and Order, 728 F.Supp. 1032, 1048–57 (S.D.N.Y.1990), *aff'd* 907 F.2d 277 (2d Cir.1990); *Local 27 v. Carberry, et al.*, July 20, 1990 at 3–4, 1990 WL 108348 (S.D.N.Y.1990); *Joint Council 73, et al. v. Carberry, et al.*, 741 F.Supp. 491, 493 (S.D.N.Y.1990); August 27, 1990 Opinion and Order, 745 F.Supp. 908, 911; September 18, 1990 Opinion and Order, 745 F.Supp. 189, 191–92. The Independent Administrator and Investigations Officer are stand-ins for the General President and GEB for the purpose of the instant disciplinary action. Hearings before the Independent Administrator are conducted pursuant to the same standards applicable to labor arbitration hearings. Consent Decree, ¶ F.12.(A)(ii)(e).

█ Paragraph F.12.(C) of the Consent Decree mandates that the Independent Administrator must decide disciplinary hearings using a "just cause" standard. Consent Decree at 9. Paragraph K.16 provides that this Court shall review actions of the Independent Administrator using the "same standard of review applicable to review of final federal agency action under the Administrative Procedures Act." Consent Decree at 25. This Court may only overturn the findings of the Independent Administrator when it finds that they are, on the basis of all the evidence, "arbitrary or capricious." This Court and the Court of Appeals have interpreted ¶ K.16 to mean that decisions of the Independent Administrator "are entitled to great deference." 905 F.2d at 616 (2d Cir.1990) *aff'g* March

13, 1990 Opinion and Order, 743 F.Supp. 155 (S.D.N.Y.1990).

A. Standard for Establishing Just Cause

█ The Consent Decree is silent on the standard of review that the Independent Administrator should use to determine if just cause has been proved at disciplinary hearings. The Independent Administrator ruled that the Investigations Officer must establish just cause at disciplinary hearings by a fair preponderance of the evidence. Salvatore argues that the application of this standard was arbitrary and capricious, and that the Independent Administrator should have evaluated just cause on the stricter "clear and convincing" standard of proof contained in Local 191's by-laws. Salvatore's argument is without merit.

Salvatore can point to no authority in the IBT constitution or the Consent Decree to support his argument. Salvatore's disciplinary hearing was not conducted under Local 191's by-laws. His disciplinary hearing was conducted by the Court Officers acting as stand-ins for the General President and GEB. The Court of Appeals for the Second Circuit has expressly interpreted this Consent Decree as granting the Independent Administrator with "the final authority to determine what constitutes an offense subject to discipline under the IBT constitution." *United States v. International Brotherhood of Teamsters, supra*, 905 F.2d at 619. As an exercise of that power, the Independent Administrator determined that the standard of proof required to sustain charges was the preponderance of the evidence standard. Salvatore has not demonstrated that this determination was arbitrary or capricious.

To rule that each disciplinary hearing should be conducted under the rules applicable to each of the 700 locals would create a situation where IBT members charged with the same offense would be tried under different standards of proof. Additionally, conducting hearings by each local's rules would risk those locals amending their constitutions to impose a higher standard of

proof, in an attempt to frustrate the Court Officers. Either situation is unacceptable.

This Court and the Court of Appeals have reviewed disciplinary determinations of the Independent Administrator on many occasions. *See United States v. International Brotherhood of Teamsters, supra,* 905 F.2d 610, *aff'g* March 13, 1990 Opinion and Order, *supra,* 743 F.Supp. 155; August 27, 1990 Opinion & Order, *supra,* 745 F.Supp. 908; September 18 Opinion & Order, *supra,* 745 F.Supp. 189. Thus, I am surprised to find the standard of proof issue raised since this Court and the Court of Appeals have never expressed any doubt as to the standard applied by the Independent Administrator to determine whether just cause had been proved.

The evidence offered by the Investigations Officer and relied upon by the Independent Administrator in this case is more than sufficient to find just cause that the charges had been proved.

### B. Salvatore's Defenses

#### 1. *Collateral Estoppel/Res Judicata*

■ Salvatore argues that charge II was barred by the doctrines of res judicata and collateral estoppel because the General President of the IBT conducted a trusteeship hearing involving Local 191. Salvatore's arguments in this regard are substantially the same as those he advanced before the Independent Administrator. The Independent Administrator concluded that since the Investigations Officer was neither a party to the trusteeship proceedings nor in privity with the General President, those defenses were unavailable. This Court agrees, substantially for the reasons set out in the opinion of the Independent Administrator. *See* opinion of the Independent Administrator at 347–49.

#### 2. *Article XIX, § 3(d) Defense*

■ Salvatore argues that charge II was barred since he was recently elected to his current post by the Local 191 membership, who Salvatore alleges knew generally of the charges against him. As a result, Salvatore contends that charge II is barred by Article XIX, § 3(d) of the IBT Constitution, which holds that an officer shall not face disciplinary charges for an offense which was "known generally" to the membership when re-elected.

Salvatore argues that the principal challenged actions, the car and the severance pay, were approved by votes of the membership, so they must have "known generally" of the conduct. Salvatore's argument is completely without merit. The Independent Administrator noted this Court has previously considered the Article XIX, § 3(d) defense, and held that to invoke this defense the charged member must prove that "the membership ... had conclusive knowledge that the defendants were actually guilty of the conduct charged" when they were elected. November 2, 1989 Memorandum & Order, *supra,* 735 F.Supp. at 517; March 13, 1990 Opinion and Order, *supra,* 743 F.Supp. at 165–66. The Independent Administrator rejected this defense to charge II. This Court agrees with this conclusion for the reasons stated by the Independent Administrator in his opinion. *See* opinion of the Independent Administrator at 346–47.

### C. Sufficiency of the Evidence

■ Salvatore argues that the factors relied on by the Independent Administrator to find that the charge II had been sustained were insufficient under any standard. Specially, Salvatore argues that the Independent Administrator improperly relied on circumstantial evidence to make his conclusion, especially with regard to Salvatore's intent. Considering the standard of proof necessary to prove the charges, and the deference to be given determinations of the Independent Administrator, Salvatore has not demonstrated that the Independent Administrator abused his discretion.

Guided by 29 U.S.C. § 501(c), the Independent Administrator determined that to sustain charge II, the Investigations Officer needed to demonstrate that Salvatore "acted with fraudulent intent to deprive the Union of its funds." The Independent Administrator determined that Rossetti's severance pay, vacation pay, and car, payments totalling over $75,000, were not in

the best interest of Local 191 or its membership, but were made solely for the use and enjoyment of Rossetti. The Independent Administrator then determined that Salvatore's failure to investigate or question the propriety of these payments was evidence that he acted intentionally.

Salvatore argues that it was arbitrary and capricious for the Independent Administrator to conclude that Salvatore had fraudulent intent from his failure to investigate whether the severance pay, vacation pay, and car transaction were in the best interests of Local 191. Salvatore argues that it was error for the Independent Administrator to rely on circumstantial evidence at all.

■ First, with respect to Salvatore's overall argument regarding circumstantial evidence, it is hornbook law that circumstantial evidence is of no less value than direct evidence. In our system, even criminal juries are charged that this is so. It is absurd to argue that the consideration of circumstantial evidence is inappropriate in an internal union disciplinary hearing.

■ Second, Salvatore's argument that it was error for the Independent Administrator to glean his intent from his failure to investigate the propriety of these payments is also without merit. At the outset, federal law imposes a heightened fiduciary duty of responsibility on union officials to "hold its money and property solely for the benefit of the organization and its members ..." 29 U.S.C. § 501(a). Article XIV, Section 1(d) of the constitution of Local 191 imposes an affirmative duty upon its officers to "investigate any alleged breach of fiduciary duty ..." Further, in the labor context it is permissible to draw negative inferences from the failure of a union fiduciary to act when he has an affirmative duty to do so. March 6, 1989 Opinion and Order, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989); *United States v. Local 560, International Brotherhood of Teamsters*, 780 F.2d 267, 284 (3d Cir.1985). Accordingly, the Independent Administrator did not err in determining that Salva-

tore's intent could be proved from his failure to investigate.

The factors relied on by the Independent Administrator sufficiently demonstrate that Salvatore acted with fraudulent intent. Salvatore never asked Rossetti if he was guilty of the crime to which he was pleading guilty. Salvatore did not discuss the propriety or implications of selling the Cadillac to Rossetti, who had just pleaded guilty to a felony involving Local 191's own health funds. Salvatore stated that "my own concern was me."

Further, the Independent Administrator noted that in 1989, Salvatore objected to Roberto buying his union car for $1 as a being disservice to the membership. At that time, Roberto and Salvatore were opponents for the office of Secretary–Treasurer of Local 191. The Independent Administrator determined that Salvatore was fully knowledgeable of his duty to affirmatively investigate breaches of fiduciary duty, but only undertook such conduct in more opportune circumstances.

These factors are sufficient to prove that Salvatore acted with fraudulent intent to deprive the union of its funds. Considering the evidence before the Independent Administrator, and the deference to be given his determinations, this conclusion was neither arbitrary nor capricious.

## D. The Penalty

■ The Independent Administrator suspended Salvatore from union office or membership for a period of two years. Salvatore argues that this penalty is unfair because (1) Salvatore should have been allowed to participate in the settlement reached between the other members of the Local 191 general executive board and the Investigations Officer, and (2) Salvatore should not be barred from IBT membership. Neither contention is meritorious.

First, that the Investigations Officer settled disciplinary charges against other members of the Local 191 GEB is of absolutely no moment with respect to these charges against Salvatore.[2] Salvatore was

---

2. On January 10, 1990, the Investigations Officer filed charges against the General Executive

specifically excluded from that settlement, *which he himself signed.* The Independent Administrator found that these charges do not unfairly single out Salvatore, noting that Salvatore is the only one among Salvatore, Rossetti, and Roberto still employed by Local 191.

 Second, Salvatore has not offered a single compelling reason why he should not be barred from IBT membership. The Independent Administrator considered the seriousness of the conduct, as well as mitigating facts. This penalty was neither arbitrary nor capricious.

### III. Conclusion

IT IS HEREBY ORDERED that the opinion of the Independent Administrator, appended as exhibit 1, is affirmed in all respects.

IT IS FURTHER ORDERED that the voluntary stay on the imposition of the penalty entered by the Independent Administrator is dissolved.

So Ordered.

### APPENDIX

Investigations Officer, Claimant,

v.

Mario J. Salvatore, Respondent.

### OPINION OF THE INDEPENDENT ADMINISTRATOR

This matter is before me to hear and adjudicate charges filed by Charles M. Carberry, Investigations Officer, against Mario Salvatore, the Secretary–Treasurer of IBT Local 191 located in Bridgeport, Connecticut. Salvatore's charges were originally scheduled to be heard along with four other charges filed by the Investigations Officer against Connecticut IBT Local 443; Local 443's Secretary–Treasurer Edward Brereton; Local 191; and Joseph Roberto, a former officer of that Local. These charges were resolved by agreement with the Investigations Officer.[1]

Given that the Salvatore charges were not resolved, a hearing was conducted on May 2, 1990. Having reviewed the record before me, including the post-hearing submissions, I find that the Investigations Officer has not met his burden of sustaining Charge 1 against Salvatore, but has met his burden on Charge 2. The following opinion constitutes my findings of fact and conclusions of law.

### I. The Charges Against Salvatore

#### A. The IBT Constitutional Provisions

The charges against Salvatore implicate the following two provisions of the IBT Constitution:

1. Article II, Section 2(a), which provides:

Any person shall be eligible to membership in this organization upon compliance with the requirements of this Constitution and the rulings of the General Executive Board. Each person upon becoming a member thereby pledges his honor: to faithfully observe the Constitution and laws of the International Broth-

Board of Local 191. The charges related to the actions of the executive board in approving the pay raises, severance pay schedule, and automobile purchase resolutions. These charges were settled by agreement between the Local 191 executive board and the Investigations Officer, which was approved by the Independent Administrator on May 30, 1990. Among other things, the settlement provided that members of the GEB would repay the sum of $57,855 to Local 191 for monies transferred to Rossetti. Further, the settlement specifically excluded Salvatore, as the Investigations Officer reserved the right to file separate disciplinary charges against Salvatore.

1. The agreement entered into with Local 443's Executive Board and Mr. Brereton required re-

imbursement to Local 443 by its Executive Board and Brereton in the amount of $78,177. Salvatore, along with the rest of Local 191's Executive Board, entered into an agreement resolving the Local 191 charge. That agreement provided, in part, that the individual board members of Local 191, with the exception of Salvatore, would reimburse Local 191 $57,855. A more detailed discussion of this agreement appears at p. 14 [at p. 346], *infra.* In Roberto's agreement, Roberto promised never to seek union office again. These agreements were all approved by me, copies were filed with United States District Judge David N. Edelstein, and the originals were retained by the Investigations Officer.

erhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the Bylaws and laws of his Local Union; to comply with all rules and regulations for the government of the International Union and his Local Union; to faithfully perform all the duties assigned to him to the best of his ability and skill; *to conduct himself or herself at all times in such a manner as not to bring reproach upon the Union....* [emphasis supplied]

2. Article XIX, Section 6(b)[2], which provides:

The basis for charges against members, officers, elected Business Agents, Local Unions, Joint Councils or other subordinate bodies for which he or it shall stand trial shall consist of, but not be limited to, the following:

(1). Violation of any specific provision of the Constitution, Local Union Bylaws or rules of order, or failure to perform any of the duties specified thereunder.

(2). Violation of oath of office or of the oath of loyalty to the Local Union and the International Union.

(3). Embezzlement or conversion of union's funds or property.

(4). Secession, or fostering the same.

(5). Conduct which is disruptive of, interferes with, or induces others to disrupt or interfere with, the performance of any union's legal or contractual obligations. Causing or participating in an unauthorized strike or work stoppage.

(6). Disruption of Union meetings, or assaulting or provoking assault on fellow members or officers, or failure to follow the rules of order or rulings of the presiding officer at meetings of the Local Union, or any similar conduct in, or about union premises or places used to conduct union business.

(7). Crossing an authorized primary picket line established by the member's Local Union or any other subordinate body affiliated with the International Union.

B. Charge 1

The first charge against Salvatore relates to a 1986 indictment, *United States of America v. Anthony G. Rossetti, et al.,* Cr. No. N–86–30 (PCD) (Conn.) (the "Indictment"), which named fifteen defendants, including Salvatore. In the Indictment, Salvatore was charged with embezzling $5,000 from the Teamsters Local 191 Health Services and Insurance Plan (the "Plan"). In 1977 Salvatore entered into a plea agreement with the Government pursuant to which he:

plead guilty, to two counts charging violation of 29 U.S.C. § 1311 for aiding and abetting the willful failure to keep and maintain accurate and complete Plan records.

As part of his plea agreement, Salvatore agreed to make restitution to the Plan of $5,000. Salvatore was also required to "resign forthwith" as President of Local 191 and not to seek or accept any Executive Board or elected union office in Local 191 as part of his plea bargain.[3] *See* Investigations Officer's Ex. 12 (Salvatore's plea agreement). In July of 1987, a judgment of conviction was filed pursuant to Salvatore's plea agreement and the Government dismissed the embezzlement charge against

---

2. At a November 1, 1989, special meeting of the IBT's General Executive Board ("GEB") a resolution was adopted purporting to review and interpret certain provisions of the IBT Constitution, including Article XIX, Section 6(b). In a decision dated January 11, 1990, in the matter of *Investigations Officer v. Friedman and Hughes,* I rejected the GEB's interpretation as unreasonable. United States District Judge David N. Edelstein endorsed and approved my ruling in his Opinion and Order dated March 13, 1990. In an Opinion dated June 1, 1990, the United States Court of Appeals for the Second Circuit affirmed Judge Edelstein's March 13, 1990, ruling. *United States v. International Brotherhood of Teamsters,* Docket Nos. 89–6248, *etc., slip op.* [905 F.2d 610 at pp. 617–620] (2d Cir. June 1, 1990), at pp. 16–25.

3. Although Salvatore apparently breached his plea agreement by seeking and being elected to the office of Secretary–Treasurer of Local 191 in 1989, no charge is before me based on that fact.

him. At sentencing Salvatore was fined $1,000 on the false records conviction charge. *See* Investigations Officer's Ex. 14.

Based upon these underlying facts the Investigations Officer charges Salvatore as follows:

Violating Article II, § 2(a) of the [IBT] Constitution by conducting yourself in a manner to bring reproach upon the IBT:

TO WIT, you embezzled monies from the Teamsters Local 191 Health Services and Insurance Plan ... and aided and abetted the willful failure to keep and maintain accurate Plan records in violation of law ... [4]

The Investigations Officer's argument supporting the embezzlement allegation is a simple one: "To avoid prosecution on the embezzlement charge, Salvatore agreed to pay the monies [the $5,000] back." The Investigations Officer argues that "[t]he use of the term 'restitution' in the plea agreement ... was premised on the fact that [Salvatore] embezzled money from the Plan and, thus, was required to pay the money back." *Id.* at p. 5. The Investigations Officer summarizes that "[n]o other conclusion can be drawn...." *Ibid.*

This being the extent of the Investigation Officer's proof on Charge 1, I find that under the "just cause" standard, pursuant to which I must decide all disciplinary cases,[5] the Investigations Officer has failed to meet his burden of proof. The Investigations Officer failed to produce any evidence of embezzlement. Moreover, at the May 2, 1990, hearing, Salvatore denied embezzling the $5,000. *See* T160–22 to 24.[6] Given that the Investigations Officer failed to produce any proof on Charge 1, such a denial must be considered.

I do not accept Salvatore's plea on the lesser criminal charge of failing to maintain accurate Plan records, even when ac-

companied by an agreement to pay $5,000 in restitution, as evidence of embezzlement. The undisputed fact remains that the criminal charge of embezzlement against Salvatore was dismissed. The inference drawn by the Investigations Officer of embezzlement arising from the $5,000 payment is not the only plausible inference to be drawn. *See* Salvatore's Post–Hearing Memorandum at pp. 12–13.

One alternate inference is "that Mr. Salvatore paid $5,000 to compensate the Plan for possible overpayments which may have resulted from Mr. Salvatore's having aided and abetted the failure to maintain adequate records." *Ibid.* Another inference is that he "was willing to pay $5,000 rather than bear the risk, legal expense (probably greater than $5,000), and the prolonged disruption of family and professional life that would flow from the decision to reject the government's offer of a settlement and proceed to a litigated criminal trial." *Ibid.* Each of these inferences is as plausible as the inference of embezzlement. Accordingly, I find that the Investigations Officer has not carried his burden of establishing by a preponderance of the evidence just causes for finding that Salvatore committed the embezzlement charged.

## C. Charge 2

### 1. The Allegations

In Charge 2 Salvatore is alleged to have: (1) "[v]iolat[ed] Article II, § 2(a) of the IBT Constitution by conducting [himself] in a manner to bring reproach upon the IBT;" and (2) "[v]iolat[ed] Article XIX, § 6(b) of the IBT Constitution, by failing to perform [his] duties as a union officer and embezzling and converting to [his] own use and the use of others unions funds."

Factually, the Investigations Officer alleges that after Salvatore was indicted in

---

**4.** The Investigations Officer withdrew that portion of Charge 1 regarding the failure to keep and maintain accurate Plan records. Thus, that part of the charge is not before me.

**5.** The Consent Order entered into between the IBT leadership and the Government, from which I derive my disciplinary authority, provides at para. F.12(A), p. 9: "The Administrator

shall preside at hearings in such cases and decide such cases using a 'just cause' standard."

**6.** All transcript references, unless otherwise noted, are to the transcript of the May 2, 1989, proceedings. The first reference in a transcript cite, in this case "160", refers to the page number. The second reference in the cite, in this case "22 to 24", refers to the line numbers.

1986 in *United States v. Rossetti, et al.*, he "conspired to and participated in efforts with other officials of Local 191 to conduct a scheme to improperly funnel union monies under the disguise of severance and other improper benefits for the officials who embezzled monies from the Plan." The Investigations Officer charges that "[t]hose payments were not for the benefit of the members of Local 191 and furthered no legitimate interest of the Local."

At the hearing, the following was established:

a. Salvatore, the then President of Local 191, and Rossetti, the then Secretary–Treasurer of Local 191, were indicted in June of 1986. Investigations Officer's Ex. 2 (the "Indictment"). Joseph Roberto, then Recording Secretary of Local 191, was also named in the Indictment and charged with embezzlement. Roberto was separately charged by the Investigations Officer, and as noted, Roberto resolved his charges by promising never to seek Union office. *See* p.2 [p. 340], *supra.*

b. A meeting was held on July 12, 1986, at which the Local 191 membership in attendance was informed about the Indictment and Salvatore proclaimed his innocence. T50–11 to 52–24; Investigations Officer's Ex. 16 at pp.71–72.

c. At a meeting held August 9, 1986, the Local 191 Executive's Board, including, of course, Salvatore, approved a pay raise for Rossetti of $100 per week.[7] T54–1 to 55–19; Investigations Officer's Ex. 16 at p.76. At that meeting, Salvatore said nothing about the Indictment. T55–20 to 24.

d. At that same August 1986 meeting, Rossetti approved a raise for all Local 191's employees including Salvatore. These raises were not reported in the minutes of the meeting. T62–19 to 63–20. Salvatore Post–Hearing

Memorandum, at p.20; Investigations Officer's Ex. 16 at pp.73–77.

e. At a nomination meeting conducted September 6, 1986, Salvatore nominated Rossetti for re-election as Secretary–Treasurer, Roberto seconded that nomination. Rossetti was elected without opposition. At that time Rossetti nominated Salvatore as Business Agent. Roberto seconded that nomination. Rossetti then nominated Roberto as Business Agent. That nomination was seconded by Salvatore. Both Roberto and Salvatore were elected as Business Agents unopposed. Investigations Officer's Ex. 16 at pp.90–95.

f. Although in most years Local 191 employees received only one raise, at a meeting of Local 191's Executive Board held on December 20, 1986, Rossetti was given a second $100 per week raise, effective January 1, 1987, and the members of the Executive Board, including Salvatore, were given a second raise of $50 per week, also effective January 1, 1987. T62–5 to 9; T63–7 to 20; Investigations Officer's Ex. 16 at pp.123–124. These raises were not reported in the minutes of the meeting. Investigations Officer's Ex. 17 at pp.3–12; T63–7 to 20.

g. In December of 1986, Rossetti purchased, with Local 191 funds, a 1987 Cadillac Eldorado at the price of $31,669.00. T64–8 to 65–24; Investigations Officer's Ex. 21. Salvatore did not question Rossetti's decision to buy the car. T65–23 to 24. The purchase of the car was not reported in the minutes of the Local. Investigations Officer's Ex. 17 at pp.3–12.

h. On April 4, 1987, a special meeting was noticed by Rossetti. T79–18 to 80–3; Investigations Officer's Ex. 49. In Rossetti's absence, Salvatore chaired the meeting. T83–1 to 14; Investigations Officer's Ex. 17 at pp. 32–34. In his update on the Indict-

---

7. Although the minutes of the August 9, 1986, meeting reflect a $100 "per week wage," it is clear that Rossetti was given a $100 per week raise.

ment, Salvatore told the membership he was "innocent and looked forward to the trial." T83–20 to 84–2. The next item of business at the meeting was the passage of the resolution providing that "any paid officer forced to leave the job other than [by] loss of an election shall be entitled to one week severance for each year of service." T84–9 to 86–2; Investigations Officer's Ex. 17 at 33. At that same meeting, a motion was passed "reaffirming" an earlier motion providing "any officer with either nine years service or three consecutive terms" could purchase for one dollar the Local Union car assigned for his use. T92–13 to 93–11; Investigations Officer's Ex. 17 at p.33.

i. At the April 4, 1987, meeting, Salvatore knew that his trial as well as the trials of Rossetti and Roberto were imminent. Investigations Officer's Ex. 17 at pp.6, 15–16, 20, 25; T83–20 to 84–2. In addition, Salvatore knew his attorney was attempting to negotiate a resolution with the Government. In fact, Salvatore knew his attorney "was talking to the government since the day [he] was indicted." T126–19 to 21.

j. On April 10, 1987, Rossetti agreed to plead guilty to embezzlement of approximately $16,800 from the Plan. Investigations Officer's Ex. 5. Pursuant to his judgment of conviction filed on April 24, 1987, Rossetti was sentenced to two years' imprisonment, suspended after three months, and three-months probation on condition that he make restitution to the Plan of $24,000. Rossetti was also barred by the Court from holding Union office for eight years. Investigations Officer's Ex. 7.

k. On May 12, 1987, with Salvatore's knowledge, Rossetti was paid the $33,000 in "severance pay" in accordance with the April 4, 1987, severance resolution which calculation was based on his recent pay increases. T95–10 to 20.[8] Rossetti also received approximately $11,000 in accrued vacation pay. T115–4 to 11.

l. On May 21, 1987, Roberto entered into a plea agreement. Investigations Officer's Ex. 9. The next day, Salvatore entered into his plea agreement. Investigations Officer's Ex. 12. Those agreements made no provision regarding sentencing.

m. On June 8, 1987, the same day Rossetti's court ordered resignation from Local 191 became effective, the Local 191 Executive Board sold Rossetti the six-month-old Cadillac for one dollar. Investigations Officer's Exs. 20 and 21. Salvatore never considered the propriety of this transfer or the propriety of giving Rossetti severance pay and vacation pay. T125–5 to 23.

n. On July 14, 1987, Salvatore's and Roberto's judgments of conviction were filed. Investigations Officer's Ex. 14.

o. On February 21, 1990, after the Investigations Officer's charges had been filed, and the day before trusteeship proceedings were initiated by the IBT General President against Local 191,[9] Local 191 filed a civil suit against Rossetti (at Salvatore's in-

8. At the May 2, 1990, hearing, the following exchange took place on the cross-examination of Salvatore by the Investigations Officer:
Q. You knew that $33,000 was more severance than [Rossetti] was entitled to, isn't that correct?
A. Let me say to the Court very clearly, at that point in time in my life and what was going on, I felt it was proper. Hindsight looking back, based on what I know today, it was wrong. [197–12 to 17]

Apparently, what led to this testimony was some confusion regarding the fact that Rossetti had already been paid his severance entitlement through 1983 at the time he received his 1987 distribution. Investigations Officer's Post–Hearing Memorandum at p. 15.

9. The trusteeship proceedings are discussed in greater detail at pp. 20–23 [pp. 349–50], infra.

struction) to recover the value of the car given to him in 1987 and the severance pay he received. T166–4 to 167–10; Respondent's Ex. 6. In Local 191's complaint, it is alleged that Rossetti, in his capacity as Secretary–Treasurer of Local 191, submitted a proposed by-law amendment to the International President for approval in March of 1986. That amendment authorized the transfer of automobiles to retiring officers of Local 191, so long as they served three consecutive terms, or nine consecutive years, whichever comes first. The complaint further alleges that Rossetti failed to disclose to the Local 191 Executive Board that the request for approval of the proposed amendment was rejected by the International President. Finally, the complaint alleges that the taking of the automobile and the severance pay "was not in accordance with the By-laws and the Constitution of the Local [or International Union] and not solely for the benefit of Local 191 and its members."

p. On May 30, 1990, I approved the agreement entered into between the Investigations Officer and Local 191. In addition to the $57,855 in restitution contemplated by that agreement, it provided that the Local's Executive Board "shall propose and unanimously recommend" that the "severance and vacation policies for salaried officers, business agents, assistant business agents and organizers" be amended to provide, *inter alia*, that vacation pay "may not be accrued from year to year," and that severance payments shall be calculated in accordance with a sliding scale which tops out with six week's salary after 25 years or more of service. In addition, the proposed amendments contemplated that "[n]o severance payments shall be made to officers ter-

minated for cause, or required to leave office by operation of law or the terms of [the] agreement." The Executive Board also agreed that the August 4, 1987, resolutions were of no force and effect.

### 2. Salvatore's General Defenses To Charge 2

a. The Contention That Salvatore Has Been "Singled Out For Punishment"

Salvatore contends that since the Investigations Officer resolved his charges against Local 191 by an agreement entered into with Local 191's Executive Board, which includes Salvatore, Salvatore cannot now be singled out for harsher treatment. This contention is without merit.

First, the Local 191 agreement, which Salvatore signed, specifically states: "Mario Salvatore is expressly excluded from the Investigations Officer's agreement not to file individual charges against members of the board."

Second, "of the three board members who stood to profit from the severance scheme [Rossetti, Roberto and Salvatore], only Salvatore remains in office, and employed by the union.[10] The other members of the board, while they went along with the plan, were not the beneficiaries of the scheme." Investigations Officer's Post–Hearing Reply Memorandum at p.15.

Citing to my decision in *Investigations Officer v. Bernard, et al.*, (May 22, 1990), in which I found that "the Investigations Officer had failed to produce any evidence which would tend to prove that" the respondents in that case, who were charged with participating in a group demonstration, were culpable as charged, Salvatore states:

The principle is clear: individual guilt must be individually proved and may not be imputed from a person's membership in a group.
[Salvatore's Post–Hearing Memorandum at p. 36].

---

**10.** As a result of his 1987 conviction, Rossetti was barred from holding Union office for eight years. Roberto is barred for life from holding

Union office under his agreement with the Investigations Officer.

While this is most certainly true, Salvatore seems to be suggesting that one who participates in alleged wrongdoing with others cannot be charged unless each and every wrongdoer is similarly charged. Such a contention lacks merit and is accordingly rejected.[11]

### b. The Article XIX, Section 3(d) Defense

Article XIX, Section 3(d) of the IBT Constitution provides, in pertinent part, as follows:

> Charges against elective officers of the International Union or any subordinate body shall be limited only to those activities or actions occurring during their current term of office, and only those activities and actions occurring prior to their current term which were not then known generally by the membership of the International Union or the subordinate body in the case of an officer of a subordinate body.

It is now settled that a respondent who raises the Section 3(d) defense has the burden of proving "that the membership ... had conclusive knowledge that defendants were actually guilty of the conduct charged when they were" elected to their current term of office. *United States v. IBT*, 735 F.Supp. 506, 517 [withdrawn and replaced by 743 F.Supp. 155, 166] (S.D.N.Y.), *aff'd*, Docket Nos. 89–6248, *etc.*, *slip op.*, [905 F.2d 610 at p. 620] (2d Cir. June 1, 1990), at pp. 25–26.

Salvatore was elected Secretary–Treasurer of Local 191 in October, 1989. T4–20 and 22. Salvatore argues that since "the principal challenged actions, giving Mr. Rossetti a car and severance pay, actually resulted from a membership vote on a resolution from the floor ... [i]t is inconceivable that the same membership which so voted could be said not to have known 'generally' what it was doing prior to October 1989." Salvatore Post–Hearing Memorandum at pp. 36–37. Salvatore goes on to argue that "membership," as that term is used in Section 3(d), "must therefore be determined to mean those who 'take an affirmative part in the business and activities of the Union' by, *at a minimum*, attendance at membership meetings." *Id.* at 37 (emphasis in original). Salvatore also alludes to the testimony of eleven individuals who testified at the May 2, 1990, hearing. These individuals all stated that they knew about the car and severance payment resolutions because of their participation in membership meetings. T176–24 to 220–11. Salvatore also cites to the transcript of the hearing in the Local 191 trusteeship proceeding [12] as evidence that the "issues surrounding the severance pay and car were well known to the membership in 1987." Salvatore Post–Hearing Memorandum at p. 37.

Salvatore's reliance on Section 3(d) is misplaced for several reasons.

Salvatore's narrow interpretation of the term "membership" as used in Section 3(d) is at odds with the plain import of that section. Section 3(d) is designed to prevent the upsetting of election results through the subsequent filing of disciplinary charges when the electorate casts their votes with full prior knowledge of the activities and actions charged. To limit the term "membership" to only those who attend membership meetings, and thus exclude those members who while not attending meetings vote in an election, is to frustrate the intent of Section 3(d). In this case, the parties stipulated that between 150 and 210 members generally attend the quarterly general membership meetings of Local 191." T248–11 to 14. Two of Salvatore's witnesses testified that the membership of Local 191 totals approximately 3,000. T180–23 to 181–1; T192–23 to 193–2. If Salvatore's interpretation of "membership" was adopted, approximately 94% of the Local 191 would be disenfranchised. No proof was offered as to what, if anything, the vast majority of the membership

---

11. While I agree that those similarly charged should, when possible, be similarly punished, it cannot be denied that each and every respondent brings with him or her a unique set of facts to a disciplinary proceeding.

12. The trusteeship proceeding is discussed in greater detail in at pp. 20–23 [at pp. 349–50], *infra.*

who did not attend the meetings in question, knew concerning Salvatore's alleged wrongdoing.

Moreover, even those members who regularly attend meetings would not have learned of the August 1986 or December 1986 pay raises since those raises were passed during Executive Board meetings and were not recorded in the minutes. In the same respect, the purchase of the Cadillac in December of 1986 was not reported in any minutes.

Lastly, and perhaps most importantly, the charge in question goes far beyond the mere involvement of Salvatore in the passage of resolutions regarding a car and severance payments. The charge details an involved scheme to "embezzl[e] and convert" union funds to Salvatore's use and the use of others. While the car and severance resolutions may be an integral part of that scheme, the mere fact that these resolutions were passed does not, in and of itself, contemplate the full scope of the charged wrongdoing. The very fact that Salvatore has denied these allegations and has launched a vigorous defense of the charge, is proof that the membership of Local 191 could not have generally known of Salvatore's wrongdoing before his election in 1989. *See Investigations Officer v. Friedman, et al.* (Opinion of the Independent Administrator, September 29, 1989), *aff'd, United States v. IBT,* 725 F.Supp. 162, 165 (S.D.N.Y.1989), *aff'd,* Docket Nos. 89–6248, *etc., slip op.* [905 F.2d 610] (2d Cir. June 1, 1990) (wherein it was held that since respondents were vigorously challenging their criminal convictions at the appellate level and continued to deny the criminal charges at the disciplinary hearing, their "activities and actions" could not have been generally known to the union membership that elected them).

### c. Salvatore's Alleged Failure To Investigate

In his Post–Hearing Memorandum at p. 19, the Investigations Officer argues:

Even if the substantial evidence of Salvatore's active complicity with Rossetti were to be ignored, the most benign description of his behavior is deliberate indifference of his fiduciary duties. He completely disregarded his fiduciary and constitutional duties as an officer of Local 191 to investigate the circumstances surrounding Rossetti's indictment and subsequent guilty plea to embezzlement.

Salvatore contends that "[t]his allegation was *not* included in the charge against Mr. Salvatore as an individual nor was any other alleged failure to investigate asserted." Salvatore Post–Hearing Reply Memoranda at p.39 (emphasis in original). Salvatore characterizes the "Investigations Officer's attempt to introduce it in his post-hearing memorandum [as] improper." *Ibid.* I reject this argument.

While Charge 2 does not use the words "failure to investigate," that charge clearly contemplates such a breach when it alleges that Salvatore "failed to perform [his] duties as a union officer." Moreover, the issue of Salvatore's investigation, or lack thereof, into the circumstances surrounding Rossetti's indictment and subsequent guilty plea to embezzlement was probed at the May 2 hearing. *See* T56–6 to 18; T65–8 to 66–6; T94–13 to 19; T125–5 to 13.

### d. The Collateral Estoppel And Res Judicata Defenses

As explained by Salvatore in his Post–Hearing Memorandum at p.45, prior to filing the instant charges:

The Investigations Officer filed with IBT—General President William McCarthy, a nine-page single-spaced notice of the Investigations Officer's plan to institute trusteeship proceedings against Local 191, setting forth, as part of the basis for a trusteeship, the identical charges asserted against Mr. Salvatore. As provided under the Consent Order [Para. F.12.(A) ], on February 7, 1990, General President McCarthy issued a notice that a trusteeship hearing would be conducted to consider the issues raised by Mr. Carberry. Following a full day of hearing and submission of written comments, the Trusteeship Panel issued a Report

and Recommendations which the General President adopted.[13]

The "Report and Recommendations" issued by the Trusteeship Panel found that a trusteeship would be unwarranted. Relying on the trusteeship proceedings, Salvatore now argues that the Investigations Officer is barred by the doctrines of collateral estoppel and res judicata from bringing these charges.

Dealing first with the collateral estoppel argument, the standard by which the application of collateral estoppel must be tested is well settled. *See Glictronix Corp. v. AT & T*, 603 F.Supp. 552, 563–564 (D.N.J.1984); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322[, 99 S.Ct. 645, 58 L.Ed.2d 552] (1979). Salvatore cannot satisfy the first collateral estoppel requirement—"that the party to be estopped must have been a party or in privity with a party to the prior action." *Glictronix Corp., supra*, 603 F.Supp. at 563.

The trusteeship proceedings were instituted and conducted independently of the Investigations Officer. In fact, the Trusteeship Panel acknowledged that the Investigations Officer would not be permitted to attend the trusteeship proceedings, since those proceedings were an internal union matter. Transcript of Trusteeship Proceedings at 110–14 to 120–3. The Trusteeship Panel decided that the Investigations Officer's charges against "some of the officers" of Local 191 "will also have to be heard." *Id.* at 120–6 at 10. Moreover, Salvatore himself stated at the trusteeship proceeding that Mr. Carberry's work was "immaterial because this is an internal hearing." *Id.* at 142–16 to 18.

In a strained interpretation of the Second Circuit's opinion in *United States v. IBT*, Docket Nos. 89–6248, *etc., slip op.* [905

F.2d 610, at p. 622] (2d Cir. June 1, 1990), at p. 31,[14] Salvatore argues that:

> [S]ince the Investigations Officer's *only* authority over non-parties to the Consent Decree was based on his being a delegate of the International President, he obviously is in privity with him. A contrary ruling would ignore the basis found by the Second Circuit for applying the disciplinary provisions of the Consent Decree to non-parties.

[Salvatore Post–Hearing Memorandum at p. 47 (emphasis in original)].

Salvatore misses the point. The Investigations Officer and the Independent Administrator, while possessing the same investigatory and disciplinary powers of the IBT General President, act independently of the General President. The entire structure of the Consent Order rests upon this concept of independence. That independence is not compromised because our disciplinary authority may come by way of a delegation from the General President. To bind the Investigations Officer and the Independent Administrator to the disciplinary and trusteeship decision of the IBT General President would nullify the disciplinary provisions of the Consent Order. A disciplinary proceeding initiated by the Investigations Officer could be rendered moot by the General President interceding or conducting his own hearing, and issuing an exculpatory finding. Such a result is wholly unreasonable, and must be rejected.

Given that the Investigations Officer was neither a party to the trusteeship proceeding or in privity with the General President in relation to that proceeding, Salvatore's *res judicata* claim must also fail. *See Parklane Hosiery Co., supra*, 439 U.S. at 326, n. 5 [99 S.Ct. at 649, n. 5].

---

**13.** The Consent Order grants the Investigations Officer the right "to initiate disciplinary charges" and "to institute trusteeship proceedings." Consent Order, at para. F.12.(A)(i) and (ii), p. 8. The two remedies are not mutually exclusive. Before the Investigations Officer institutes trusteeship proceedings, however, the General President is afforded the opportunity to first take independent action. Para. F.12.(A), p. 8.

**14.** In that opinion, the Second Circuit held that the "investigatory and disciplinary powers of the Court-appointed Officers are proper delegations of the powers of the IBT General President and the GEB within the scope of the IBT Constitution that binds all members of the IBT."

### e. The Nature of The Benefits

Salvatore argues that the Investigations Officer has failed to sustain the charge of embezzlement and conversion because the payments at issue here were not improper *per se.* As argued by Salvatore, "[s]ever-ance and accrued vacation pay, the bulk of the payments at issue, are commonly considered earned compensation to be paid regardless of an employee's wrongdoing." Salvatore Post–Hearing Memorandum at p. 18.

There is no requirement that the Investigations Officer must first demonstrate that the payments at issue are improper *per se.* *See United States v. Welch,* 728 F.2d 1113 (8th Cir.1984) (Wherein it was held that there was sufficient evidence of defendants' fraudulent intent to embezzle Union funds by arranging for vacation and severance payments to themselves and others, to support their convictions.)

Citing to *Guidry v. Sheet Metal Pension Fund,* [——] U.S. [——], 107 L.Ed.[2d] 782, 110 S.Ct. [680] (1990), Salvatore also states that the "Supreme Court recently found it improper to impose a constructive trust on pension benefits due a union official who pleaded guilty to embezzling from the union." *Ibid.* While this may be true, the *Guidry* holding regarding the alienation of pension benefits has little relevance to the basic inquiry of whether Salvatore embezzled and converted union funds.

### 3. The Merits Of Charge 2

Guided by 29 U.S.C. § 501(c)[15] with regard to the allegations of embezzlement and conversion, I find that the Investigations Officer must prove that Salvatore acted with "fraudulent intent to deprive the Union of its funds." *Welch, supra,* 728 [F.2d] at 1118 ("Nevertheless, under any test, union officials violate Section 501(c)

only when they possess fraudulent intent to deprive the Union of its funds.").

In reviewing the overall record and considering all the evidence, I find the Investigations Officer has satisfied his burden of proving just cause for finding that Salvatore acted with fraudulent intent to convert to his own use and the use of Roberto and Rossetti funds that should have remained with Local 191. The fact that certain of the expenditures at issue were authorized by the Executive Board is of no significance. *See Local 560, supra,* 780 F.2d at 288 (Wherein it was held that approved salary increases and pension benefits to a union officer were, under the circumstances, not in the best interest of the Local or its membership, but rather were solely for the personal benefit of the union officer in question.)

As for the issue of proving Salvatore's intent, "it is permissible to infer from circumstantial evidence the existence of intent." *Local 560, supra,* 780 F.2d at 284, *citing United States v. Burell,* 496 F.2d 609, 610 (3d Cir.1974). As stated in *Local 560:*

> [I]f an individual fails to act when he has an affirmative duty to do so, negative inferences concerning his intent can be drawn from this inaction.

I find that as an officer of Local 191, Salvatore indeed had an affirmative duty to investigate and make a determination whether the pay raises to Rossetti and the other board members, the purchase and transfer of the car to Rossetti, and the subsequent severance and vacation payments to Rossetti were in the best interest of the Local. It is clear that once Salvatore gave the Rossetti benefits some study, he determined that the best interest of the Local had not been served. T165–2 to 14. Salvatore did not even take it upon himself to ask Rossetti if he was guilty of the crime to which he was pleading guilty.

---

**15.** 29 U.S.C. § 501(c) provides as follows:
**Embezzlement of assets; penalty.** Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

T94–13 to 19. In addition, Salvatore did not discuss or consider the propriety or implications of transferring the Cadillac to Rossetti who had just pleaded guilty to a felony involving the Plan. T125–5 to 23. As Salvatore himself acknowledged, "my own concern was me." T130–21.

The evidence at the hearing clearly demonstrated that when Salvatore elects to take action to investigate an award of benefits, he is capable of zealous conduct. In Salvatore's 1989 bid for the office of Secretary–Treasurer, his opponent was Joseph Roberto, the then incumbent Secretary–Treasurer, and his ally in 1987. Prior to the 1989 election, Roberto purchased a new car. T17–24 to 18–8. Salvatore objected to Roberto buying the new car because it was "a disservice to the membership." T21–17 to 21. Salvatore began investigating the purchase of the car and, in fact, expanded the investigation to "check out everything . . . as far as benefits go." T22–2 to 5. Salvatore specifically said that Roberto's purchase of the car would be a "violation of the Executive Officer's fiduciary responsibility to the membership." T22–23 to 23–3. Salvatore also challenged Roberto's claim that he would be entitled to continue to collect a salary for "90 days from the day [he] formally took office." T23–4 to 12. On the salary issue, Salvatore said that if he allowed Roberto to continue on salary as he wanted to, Salvatore would "be violating [his] fiduciary responsibilities." T23–16 to 19.

Based upon Salvatore's inaction in this case, in the face of circumstances which demanded at least a minimum of scrutiny, as compared to his action in the 1989 contested election, it is proper for me to draw negative inferences regarding Salvatore's intent.

In finding that the Investigations Officer has satisfied his burden on Charge 2, I rely on the following:

1. At the July 12, 1986, Salvatore proclaimed his innocence to the membership in attendance. No other conclu-sion can be drawn from this but that Salvatore wanted the members to be convinced of his innocence.

2. The Local 191 Executive Board granted Rossetti a pay raise in August of 1986 despite his Indictment just weeks before. Rossetti in turn granted a pay raise to the Local 191 employees which group included fellow Executive Board members who were co-defendants in the Indictment. The timing of the raises and the apparent reciprocity behind their approval bespeaks self-interest and misconduct. In addition, the absence of any mention of the raises in the minutes indicates that Salvatore and the rest of the board members were attempting to conceal their actions.

3. At a September meeting, Rossetti, Salvatore and Roberto engaged in a round-robin nomination and seconding process which led to the three being reelected unopposed. Again, while under routine circumstances such action would not raise a question, given the recent indictment naming the three and given the recent pay raises, the suggestion of collusion in the nomination process is compelling.

4. In December of 1986, a second round of pay raises were approved, but again not reported in the minutes. The conclusion must be drawn that Salvatore and his co-board members did not want the general membership to learn of the raises.

5. The December pay raises were followed by Rossetti, an indicted officer, purchasing with union funds and without question by Salvatore, an expensive luxury sedan. At a minimum, Salvatore was under a fiduciary obligation to scrutinize this purchase as he did when Roberto purchased his car in 1989.

6. At the "special" April meeting, Salvatore once again proclaimed his innocence and his desire to go to trial.[16]

---

16. The statement that the indicted officers of Local 191 would defend the criminal charges in Court was repeated by Rossetti. *See* Investigations Officer's Ex. 17 at pp. 6, 15–16.

This was done despite the fact that Salvatore's attorney "was talking to the government since the day [he] was indicted," in an attempt to resolve the criminal charges. T126–19 to 21. At this meeting, the lucrative severance scheme was passed and adopted as well as the car resolution. The impropriety of this action is clearly highlighted by Rossetti's guilty plea which followed just six days later. Given the chronology of these events, there is little doubt that these maneuvers were solely for the enjoyment of Rossetti and not for the benefit of the membership.

7. Despite Rossetti's guilty plea, he was subsequently given, without question or discussion, his severance pay calculated in accordance with the April 4, 1987, resolution, $11,000 in vacation pay, as well as the newly purchased car. The fact that Salvatore did not take any steps to scrutinize Rossetti's receipt of these benefits further demonstrates that Salvatore played a part in a scheme to funnel these benefits to Rossetti to the detriment of the Union.

8. The fact that Salvatore entered his own guilty plea shortly after Rossetti received all of his benefits further supports a finding that Salvatore's goal was to ensure that the resolutions were passed and that Rossetti profited.

In short, one cannot examine this unfolding chain of events without reaching the conclusion that Salvatore intentionally engaged in a scheme to convert union funds to Rossetti's benefit and the benefit of himself and Roberto. Rossetti's severance package, vacation pay and receipt of the car were not in the best interest of Local 191 or its membership, but rather were solely for the use and enjoyment of Rossetti.[17] Salvatore's failure to investigate or

question these transactions is taken as evidence that he acted intentionally.

## II. The Penalty To Be Imposed

As noted at the outset, p. 1 [p. 340], *supra*, Local 191, in resolution of the charge filed against it, entered into an agreement with the Investigations Officer, pursuant to which every member of the Executive Board, with the exception of Salvatore, promised "to reimburse to Local 191 $57,855 in compensation for money and property paid and transferred to ... Rossetti." Salvatore incurred no financial obligation as a result of the Local 191 agreement. Salvatore, however, consistent with his integral role in the scheme, must be sanctioned.

The recent filing of the suit by Local 191, with the approval and support of Salvatore, against Rossetti, while perhaps late coming, is considered by me a mitigating factor in the penalty to be imposed. Also accorded some weight in mitigation is the fact that Salvatore, following his election in 1989, prompted the adoption of a written benefits and compensation policy. Respondent Ex. 7; T168–11 to 172–2. That policy, which was adopted after the Investigations Officer's charges were filed (T169–5 to 9), served as the framework for the restrictions placed on vacation and severance pay which were endorsed by the Local 191 Executive Board when it entered into its agreement with the Investigations Officer. *See* p. 14 [p. 346], *supra*.

Taking into consideration the seriousness of Salvatore's wrongdoing as well as these mitigating factors, I impose upon Salvatore a period of suspension from the IBT of 2 years. This means that for a period of 2 years, Salvatore is to remove himself from all of his IBT-affiliated union positions (including, of course, membership in the IBT) and draw no money or compensation therefrom, or from any other IBT-affiliated source.

---

**17.** In addition, the pay raises to Salvatore and Roberto as well as the severance and car resolutions were also made to further the personal interest of those two indicted officers. Since their plea agreements contained no provision regarding sentencing, these two would have also benefited if ousted from office.

352

I will stay this decision and the penalty imposed, however, for a period of thirty (30) days to afford Judge Edelstein the opportunity to review my findings and conclusions all of which I will immediately submit to him by way of Application XIV.

/s/ Frederick B. Lacey
Frederick B. Lacey
Independent Administrator

Dated: October 12, 1990