UNITED STATES of America,
Appellant,

v.

Theodore N. "Ted" WELCH; John C. Fisher; James T. Schmidt, and Thomas P. Knox, Appellees.

No. 83–1376.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1983.

Decided March 1, 1984.

Rehearing Denied March 22, 1984.

Daniel V. O'Brien, St. Louis, Mo., for appellees.

Thomas E. Dittmeier, U.S. Atty., David M. Rosen, Asst. U.S. Atty., St. Louis, Mo., for appellant.

Before BRIGHT, ARNOLD and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

The Government prosecuted Teamster Union Local 600 officials Theodore N. (Ted) Welch (president), John C. Fisher (vice president), James T. Schmidt (recording secretary), and Thomas P. Knox (trustee), under a two-count indictment for conversion of union funds. Count I of the indictment charged that by disbursing $122,000 of un-

ion funds to themselves and others for vacation pay, defendants unlawfully converted union funds in violation of 29 U.S.C. § 501(c) (1976). Count II charged that by arranging for $280,000 in severance payments to themselves and others, defendants unlawfully conspired to violate section 501(c). 18 U.S.C. § 371 (1976). The district court[1] directed a judgment of acquittal on Count I[2] and submitted Count II to a jury, which convicted the defendants. On defendants' post-verdict motion for a judgment of acquittal or, alternatively, a new trial, the district court acquitted defendants on the ground that the Government failed to produce sufficient evidence of defendants' fraudulent intent. The court dismissed as moot defendants' alternate motion for a new trial. The Government appeals.

The Government argues that the record contains sufficient evidence to support the jury's finding that defendants acted with fraudulent intent. Upon review of the record, we conclude that sufficient evidence exists for the jury to have found that defendants acted with intent to defraud the union, and accordingly, reverse the judgment of acquittal entered by the district court. Because the entry of the judgment of acquittal mooted defendants' alternate motion for a new trial, we remand to the district court to consider the new trial motion in light of this opinion.

I. *Background.*

During the period of the conspiracy alleged in Count II of the indictment, December 11, 1980 to December 19, 1980, defendants comprised a majority of the executive board of Local 600. Under the union's constitution and by-laws, the executive board was empowered to expend union funds without the approval of the membership.[3]

Defendants' efforts to expend union funds for their own benefit and for the benefit of other key union personnel had their beginnings in the union's election for new officers on December 8, 1980. The membership turned out of office five of the seven members of the executive board, including President Welch, Vice President Fisher, Recording Secretary Schmidt, and Trustees Walter J. Pettus and Edwin F. Giese. Executive board members Knox (one of the defendants) and Roy Howard, secretary-treasurer of the union, retained office. Immediately after the election, the executive board met to discuss a variety of items, including vacation pay for themselves and other union officials and severance pay for outgoing officers.

At this time, the union had limited financial resources. As recently as August 1980 the union had taken itself out of bankruptcy and resumed management of its financial affairs. The union had filed a voluntary petition for bankruptcy in 1976 to protect itself after the St. Louis Motor Carriers' Association obtained a judgment against the union for several million dollars. As of September 1979, that judgment plus accrued interest exceeded $7,000,000. The parties settled the judgment on September 25, 1979, for $3,500,000, to be paid in installments, with the funds to be raised by a dues

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

2. The Government does not appeal the acquittal on Count I of the indictment.

3. Article VII, § 7.02(b) of the union constitution and by-laws empowers the executive board to "[a]pprove the salaries, benefits, allowances, direct and indirect disbursements, expenses and reimbursement of expenses for officers, agents and employees[.]"

Moreover, membership approval of executive board action is not required. Article VII, Section 7.07 provides:

Article VI of this Constitution and By-Laws grants the officers of this organization prescribed rights and authorities to do, perform and decide upon various matters and things affecting our business and affairs. This Article VII grants the Executive Board similar rights and authorities. In both instances, membership approval is not required. Nevertheless, our Executive Board shall prepare, keep and maintain minutes of their meetings reflecting the handling of our business and affairs.

increase and with a provision that the full amount of the judgment indebtedness would be due should the union default in its stipulated payment schedule. By settling the debt to the Motor Carriers' Association, and by executing waivers against the bankruptcy estate for vacation pay and severance pay, the union secured its release from bankruptcy. The trustee in bankruptcy turned over to the union approximately $300,000, $200,000 of which the union placed in certificates of deposit. As of December 1, the union held, in addition to the certificates of deposit, about $50,000 in its checking account.

At the December 8 executive board meeting, the board authorized payment of accrued vacation pay to themselves and other employees of Local 600.[4] Total expenditures for accrued vacation pay amounted to $140,000, and included $27,390 paid to defendant Welch, $13,706 paid to defendant Fisher, $14,685 paid to defendant Schmidt, and $8,060 paid to defendant Knox.

During this time defendants also took steps to obtain severance pay for themselves and other union officials. The executive board discussed severance pay for outgoing officers at the December 8 meeting, but decided to await legal advice before taking action. Although the union's attorney advised the defendants that they could take severance pay,[5] he rendered that advice without knowledge of the union's unstable financial condition. On December 11, 1980, at President Welch's direction, the union's staff members prepared approximately $280,000 in severance pay checks for numerous union officials. The checks included payments to the order of Welch for

$21,987, Schmidt for $17,308.72, Fisher for $17,308.72, and Knox for $28,938.08.

On December 19, 1980, the executive board passed a resolution to pay union officials severance pay at the rate of one month's salary, at their present rate of pay, for each year of service. The board further resolved that if the union disputed the severance payments it would be liable for the attorneys' fees incurred in successfully defending against the union's claims. Trustees Pettus and Giese voted against the severance pay motion because they believed the proposed compensation was excessive and that the union lacked the funds to pay it. At trial, both trustees testified that they had expressed their reservations about the severance pay proposal to the other board members.

Although the union lacked adequate funds in early December 1980 to pay $140,000 in vacation pay and $280,000 in severance pay, defendants managed to obtain additional funding. To cover the checks for vacation pay, defendants arranged for bank advances until they could collect on the certificates of deposit, which matured on December 17, 1980.[6] Defendants also anticipated paying the severance pay to the extent that funds became available before the end of the calendar year, when their terms of office expired. At the direction of President Welch, the union did not pay many current bills in order to accumulate cash. The efforts to obtain any severance pay failed, however, when Secretary-Treasurer Howard refused to cosign the severance checks. Howard testified that he refused to sign the checks because the union lacked

4. Everyone who received vacation pay had signed a waiver to vacation and severance pay prior to the union's release from bankruptcy.

5. On December 18, 1980, the attorney wrote a letter to the board, stating

It is my opinion that as per past practices, as well as Executive Board approval as of February 13, 1974, at Palm Springs, California, a formula for severance pay in the amount of one month's pay for each year of service, computed at the rate of compensation in effect at the termination or vacation of office, is allowable and legal.

6. Although the certificates of deposit would not mature until December 17, 1980, defendants attempted to cash them on December 9, 1980, even though in doing so they would forfeit accumulated interest on the certificates. Defendants were unable to cash the certificates early, however, because they had lost them. Although the bank allowed defendants to sign affidavits of loss in order to replace the certificates, it did not allow them to cash the certificates until the December 17 maturity date.

adequate funds to cover them. Subsequently, on December 29, 1980, Howard resigned his office because defendants had extended pressure to obtain his signature on the severance checks.

Defendants' agreement to grant severance pay to themselves and other union officials formed the basis for the count charging them with conspiracy to convert union funds in violation of 29 U.S.C. § 501(c) (1976). That statute provides,

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both. [29 U.S.C. § 501(c).]

At trial, the jury was instructed that it could find that defendants possessed fraudulent intent to violate section 501(c) if they agreed to obtain severance pay knowing that their conduct would not benefit the union. Under these instructions, defendants were found guilty of conspiracy to violate section 501(c).

In granting defendants' post-verdict motion for a judgment of acquittal, the district court ruled that the Government failed to produce sufficient evidence of defendants' fraudulent intent. The court stated:

> [A]s a general matter, the granting of severance pay benefits a union by encouraging union members to run for union offices. When a union member quits his job with a company to become a union officer, he loses his seniority with the company. If, after his term, he is not re-elected, he may not unreasonably expect to be personna [sic] non grata with management, and re-obtaining suitable employment may be difficult or impossible. Severance pay is granted by a union to compensate an ex-union official for these losses. [R. at 27.]

> \*　　\*　　\*　　\*　　\*　　\*

The evidence, viewed in the light most favorable to the government, is simply that defendants agreed to take the severance pay, knowing it would bankrupt the union. Even assuming that defendants acted knowing that their conduct was not in the best interest of the union, the Court rejects the proposition that defendants therefore acted with *fraudulent* intent. [R. at 28.] (Emphasis in original.)

On appeal, the Government contends that the district court erred in rejecting the jury's finding that defendants acted with fraudulent intent.

II. *Discussion.*

A. *Fraudulent Intent as an Essential Element Under Section 501(c).*

■ Section 501(c) does not hold union officials strictly liable for misuse of union funds. *See United States v. Durnin,* 632 F.2d 1297, 1300 (5th Cir.1980); *United States v. Bryant,* 430 F.2d 237, 239 (8th Cir.1970). By its very terms, the statute holds union officials criminally liable only when they embezzle, steal, or *unlawfully* and *willfully* abstract or convert to their own use or the use of others the funds of the union. 29 U.S.C. § 501(c); *see United States v. Gibson,* 675 F.2d 825, 828 (6th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). To prove "willfullness" under section 501(c), the government must show that the union officials possessed fraudulent or criminal intent to deprive the union of its funds. *See, e.g., United States v. Goad,* 490 F.2d 1158, 1166 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974); *United States v. Thordarson,* 646 F.2d 1323, 1335 (9th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Durnin, supra,* 632 F.2d at 1300. *See also United States v. Belt,* 574 F.2d 1234, 1238 (5th Cir.1978) ("willfullness" under section 501(c) is proved by showing that defendant "was sufficiently aware of the facts to know that he was acting wrongfully and in contravention of the trust placed in him by the union and its members").

The difficult issue posed here is whether section 501(c) holds union officials liable for conduct that is authorized by the union.

Although we held in *United States v. Goad, supra,* that union officials violated section 501(c) when they 1) possessed fraudulent intent, and 2) *acted without union authorization,* we expressly reserved the question whether a section 501(c) crime exists "when there has been a fraudulent intent and *proper authorization, but a lack of benefit to the union.*" 490 F.2d at 1166 (emphasis added). In considering the possibility of a section 501(c) prosecution for authorized conduct, we said,

> that situation presents a more troublesome issue: namely, does § 501(c) protect union funds by penalizing union officials when the members themselves have authorized union officials to expend union funds for non-union purposes? That issue must wait for another day. [*Id.*]

Here, although the union membership did not expressly authorize the expenditures, the defendants, as members of the executive board, passed the resolution granting severance pay in accordance with the union's constitution and by-laws.[7] Notwithstanding the self-dealing nature of this arrangement, the Government concedes that the union authorized defendants' actions. Union authorization, however, does not completely insulate defendants from the reach of section 501(c). As the court observed in *United States v. Sullivan,* 498 F.2d 146 (1st Cir.), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974), section 501(c) "was designed essentially to protect general union memberships from the corruption, however novel, of union officials and employees." *Id.* at 150. If union authorization were a complete defense to a section 501(c) prosecution, self-dealing in the presence of a constitution and by-laws authorizing union officials to expend union funds potentially could become a license to steal.

Although courts frequently discuss the essential elements of a section 501(c) violation, *see United States v. Thordarson, supra,* 646 F.2d at 1334; *United States v. Goad, supra,* 490 F.2d at 1164; *see generally* McKee, *Section 501(c) of the LMRDA: In Search of the Elements of the Offense,* 18 Cal.West.L.Rev. 218 (1982), few cases have precisely discussed what must be proved under section 501(c) when the conduct of union officials is authorized. Those cases that have considered authorized conduct by union officials indicate that to prove a section 501(c) violation, the prosecution must at a minimum. show that the defendants possessed fraudulent intent.

In *United States v. Dibrizzi,* 393 F.2d 642 (2d Cir.1968), a union vice president was convicted of receiving reimbursement for monies spent on personal, nonunion expenses. Arguing that he lacked the fraudulent intent required under section 501(c), he introduced evidence that his expenses were authorized by the union. The court rejected his argument, stating

> Even if appellant may have established that his expenses were, as he claims, authorized and adopted by the union, such does not absolve him of his crimes; the reach of § 501(c) is not limited to union officers who engage in stealthy larcenies or devious embezzlements but extends to an officer who "unlawfully and wilfully abstracts or converts to his own use" the funds of a labor organization. When one sends the union a voucher known to be an improper one, and then receives payment of the voucher, the crime is completed. [*Id.* at 645.]

Similarly, in *United States v. Silverman,* 430 F.2d 106 (2d Cir.1970), *modified on other grounds,* 439 F.2d 1198, *cert. denied,* 402

---

**7.** On February 13, 1974, the executive board members then holding office adopted a resolution by a four-to-two vote authorizing severance pay for outgoing officers. The resolution provided:

> Any full time officer or business representative who shall die or terminate his employment for any reason, other than discharge for cause, or shall vacate an elected office for any reason, shall receive severance pay in an amount equal to one month's pay for each full year of service, either as an officer or business representative, with a maximum of fifteen (15) months' pay. Severance pay shall be computed at the rate of compensation of the officer or business representative at the time of his death, termination or vacation of office.

U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), the court considered whether union officials violated section 501(c) when, with authorization, they contributed to a political campaign. Although the court set aside the defendant's conviction on the ground that the Government failed to prove lack of benefit to the union or absence of authorization from the union, the court specifically considered the intent requirement under section 501(c). *Id.* at 126. Judge Friendly, writing for the majority, noted that a section 501(c) offense, like violations of numerous federal "larceny-type" statutes, occurs when someone "has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done." *Id.* at 126–27. Stressing the requirement of fraudulent intent under section 501(c), the court observed in dictum that it was "doubtful whether a payment made in a bona fide belief that it was for a union's benefit and that it had been authorized or would be ratified can ever be swept under * * * section 501(c)." *Id.* at 127.

The Sixth Circuit considered whether union-authorized conduct is within the reach of section 501(c) in *United States v. Bane,* 583 F.2d 832 (6th Cir.); *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1978). In that case the president of a Teamsters local was convicted under section 501(c) for making authorized expenditures of union funds to pay the salary of a "no show" union organizer. *Id.* at 834. In sustaining the conviction, the court adopted a two-part test for cases involving the authorized expenditure of union funds. Under this test, the Government must prove first that "the defendant had a fraudulent intent to deprive the union of its funds and, second, that the defendant lacked a good faith belief that the expenditure was for the legitimate benefit of the union." *Id.* at 835–36.

██ Although *Bane* requires proof under the two-part test of both "fraudulent in-

tent" and "lack of union benefit," other courts focus solely on the defendant's fraudulent intent, and consider "lack of union benefit" only as evidence bearing on "fraudulent intent." *See United States v. Thordarson, supra,* 646 F.2d at 1335; *United States v. Marolda,* 615 F.2d 867, 873 (9th Cir.1980) (Larson, J., concurring); *United States v. Durnin, supra,* 632 F.2d at 1300. Nevertheless, under any test, union officials violate section 501(c) only when they possess fraudulent intent to deprive the union of its funds.

## B. *Sufficiency of the Evidence.*

██ Having concluded that fraudulent intent is an essential element of a section 501(c) offense, we turn to the question whether the Government has produced sufficient evidence of fraudulent intent to support the convictions. The Government argues that evidence establishing that defendants "acted to benefit themselves and not Local 600" sufficiently supports the jury's finding that they acted with fraudulent intent.[8] We disagree. The Government's theory that "fraudulent intent may be proven by showing that the defendants' conduct * * * did not benefit the union" reduces the intent requirement to an item of objective proof. The concept of intent, however, reflects a subjective state of mind and cannot be demonstrated solely upon proof of an objective criterion. *See United States v. Durnin, supra,* 632 F.2d at 1300. Rather, to prove fraudulent intent under section 501(c), the Government must demonstrate on the basis of all the evidence that the defendants acted knowing that their conduct was wrong under the circumstances. *Cf. Silverman, supra,* 430 F.2d at 126–27 (section 501(c) offense occurs when someone "has taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done").

The Supreme Court's decision in a case considering the criminal intent requirement

---

**8.** Although conceding that granting severance pay to union officials may sometimes benefit a union, the Government points out that in this case the payment of severance pay would not benefit, but would bankrupt the union.

for a federal "larceny-type" statute similar to section 501(c) supports this view. In *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951), the defendant was charged with "knowingly" converting government property after he had openly taken some used gun casings that he found on a government military range. *Id.* at 248–49, 72 S.Ct. at 242–43. Although the defendant testified that he thought the gun casings had been abandoned and that he had taken them without wrongful or criminal intent, the jury was not permitted to consider his innocent intentions. *Id.* at 249, 72 S.Ct. at 242. Instead, the trial court instructed the jury to consider only whether the defendant intended to take the gun casings, and that if he did, felonious intent could be presumed from the act itself. *Id.* Charged with these instructions, the jury found the defendant guilty of "knowingly" converting government property. *Id.* at 248, 72 S.Ct. at 242.

In reversing the conviction, the Supreme Court held that the trial court erroneously excluded the issue of criminal intent from the jury's consideration. *Id.* at 274, 72 S.Ct. at 255. By instructing the jury to enter a guilty verdict if it found the defendant intentionally removed the gun casings from government property, the trial court effectively raised a presumption of criminal intent from an isolated fact. *Id.* at 276, 72 S.Ct. at 256. The Supreme Court ruled, however, that criminal intent may not be decided by a court or presumed from an isolated fact. *Id.* at 274, 72 S.Ct. at 255. Instead, criminal intent is a factual question for the jury to determine "not only from the act of taking, but from that together with defendants' testimony and all of the surrounding circumstances." *Id.* at 276, 72 S.Ct. at 256.

Under the principles articulated in *Morissette,* the Government must in this case show something more than "lack of union benefit" to prove criminal or fraudulent intent. *Morissette* requires that the jury determine fraudulent intent on the basis of "all the evidence considered together" and in light of "all the surrounding circumstances." *Id.* at 275–276, 72 S.Ct. at 256. "Lack

of union benefit" reflects but a single item of objective proof and, as such, is an inadequate basis on which the jury may find fraudulent intent.

Although lack of benefit to the union, as a single objective fact, is not equivalent to fraudulent intent, the overall record in this case contains adequate evidence of the defendants' fraudulent intent to support their conviction for conspiracy to convert union funds. The crime of conversion, has a broad reach, for as the Supreme Court noted in *Morissette, supra,*

> Conversion * * * may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions. [342 U.S. at 272, 72 S.Ct. at 254.]

Viewing the evidence in the light most favorable to the verdict, *see United States v. Brim,* 630 F.2d 1307, 1311 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981), we believe that the jury could have concluded on the basis of the following evidence that the defendants harbored fraudulent intent to convert union funds:

1) The defendants agreed to accept severance pay knowing that the union membership would not have wanted that to be done. *Cf. United States v. Silverman, su-*

1120

*pra,* 430 F.2d at 126–27. The record shows that at the December 19 executive board meeting Trustees Pettus and Giese, who represented the membership in financial transactions, voiced opposition to the severance pay proposal on the ground that the compensation was excessive and the union lacked the funds to pay it.

2) The severance pay resolution deterred the union from taking legal action to recover the severance payments, indicating that the defendants knew that receiving severance pay could constitute a wrongful taking. The resolution provided that

> in the event Local 600 disputes the claims for severance pay, and it is determined that Local 600 is liable, then any and all attorneys' fees incurred by officers and/or business agents in obtaining said severance pay shall be assessed against Local 600.

3) When asked by a union secretary whether the union had sufficient funds to meet the staff's payroll, President Welch, one of the co-conspirators, replied that he wanted what was due him and was not concerned about the staff personnel because they still had their jobs.

4) Welch ordered that the severance checks be prepared before the executive board authorized severance pay. The severance checks were dated December 11, and the resolution authorizing severance pay passed on December 19.

5) At Welch's direction, the union did not pay many current bills in order to accumulate cash needed to cover the severance checks.

6) The defendants agreed to the severance pay resolution knowing that to do so would bankrupt the union. In reaching this conclusion, the jury could consider testimony that the union lacked sufficient funds to cover the severance checks, that the union was released from bankruptcy only four months before the severance pay resolution was adopted, and that the full amount of the debt owed to the Motor Carriers' Association would be due if the union defaulted in its payments under the settlement agreement.

7) Notwithstanding the defendants' argument that the granting of severance pay benefits a union because it encourages union members to run for union office, under existing circumstances severance pay would serve no union benefit.

Thus, on the basis of "all the evidence considered together," the jury could determine that although severance pay had been authorized, the defendants acted with fraudulent intent to convert to their own use funds that should have remained with the union.

Because the record contains sufficient evidence of defendants' fraudulent intent, we hold that the district court erred in granting a judgment of acquittal. Accordingly, we reverse the judgment of acquittal and reinstate the verdict, subject to defendants' motion for a new trial (which was mooted by the judgment of acquittal).

## C. *New Trial Motion.*

In considering defendants' motion for a new trial, the district court should determine whether the jury was properly instructed on the fraudulent intent requirement under section 501(c). Throughout this case the Government has proceeded on the theory that it may prove the defendants' fraudulent intent by showing that the contemplated severance pay would not have benefited the union. As we noted in section II.B., however, evidence showing lack of benefit to the union reflects nothing more than an item of objective proof that does not necessarily reflect a defendant's culpable state of mind. *See Morissette, supra,* 342 U.S. at 274, 72 S.Ct. at 255. Thus, although proof of "lack of union benefit" may be a factor in determining fraudulent intent, *see United States v. Thordarson, supra,* 646 F.2d at 1336; *United States v. Marolda, supra,* 615 F.2d at 873, or may even be an additional necessary element of a section 501(c) offense, *see United States v. Bane, supra,* 583 F.2d at 835–36, such proof alone does not constitute the fraudulent intent or mens rea element required for conviction.

In instructing the jury on the fraudulent intent requirement under section 501(c), the district court stated

> Fraudulent intent may be found if you find that any of the defendants knowingly and wilfully took any steps or caused any steps to be taken to obtain severance pay from Local 600, and that when they did so, they acted without the belief that these steps or conduct was for the legitimate benefit of Local 600.

Thus, the instruction linked the fraudulent intent requirement solely with the objective factor of "lack of benefit to the union." Given the erroneous theory presented by the Government in this case, this instruction may have inadequately protected the defendants' rights by permitting the jury to convict them without requiring that the Government prove beyond a reasonable doubt their knowing and wrongful violation of section 501(c). As we have observed, proof of lack of benefit to the union may be a factor bearing on fraudulent intent, but is not in itself equivalent to fraudulent intent. Thus, on remand, the district court should consider in light of this opinion the adequacy and propriety of the challenged instructions, as well as other matters contested on the motion for a new trial and whether any such challenged rulings constituted prejudicial error.

### III. *Conclusion.*

Accordingly, for the reasons set forth in this opinion, we reverse the judgment of acquittal and remand to the district court to consider defendants' motion for a new trial.