UNITED STATES of America, Appellant,

v.

Sam F. LONG, Appellee.

UNITED STATES of America, Appellant,

v.

Elmer J. CANTRELL, Appellee.

No. 90–3063.

United States Court of Appeals,
Eighth Circuit.

Submitted June 13, 1991.

Decided Dec. 12, 1991.

Rehearing and Rehearing En Banc
Denied Feb. 21, 1992.

Sheryle L. Jeans, Kansas City, Mo., for appellant.

James Wyrsch, Kansas City, Mo., for appellee Long.

Richard McFadin, Kansas City, Mo., for appellee Cantrell.

Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and LOKEN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The United States appeals from an order acquitting Sam F. Long and Elmer J. Cantrell of conspiring to embezzle money from a union in violation of 18 U.S.C. § 371 (1988), of embezzling money from a union in violation of 29 U.S.C. § 501(c) (1988) and 18 U.S.C. § 2 (1988), and of unlawfully transporting stolen money in violation of 18

U.S.C. § 2314 (1988). A jury convicted Long and Cantrell on these three counts, and the district court ordered acquittals on the grounds of insufficient evidence. 757 F.Supp. 1038. The jury also acquitted Long, Cantrell, and Edward E. Quick on seven other charges. On appeal, the government argues that the district court erred by considering only the evidence relating to the counts on which the jury convicted Long and Cantrell, and that sufficient evidence existed to support the convictions on all three counts. The government also argues that the district court erred by conditionally ordering a new trial to determine whether there was one conspiracy or multiple conspiracies. We reverse the order of acquittals and the conditional grant of a new trial.

Long was president and business manager of Local 101, a labor union affiliated with the AFL–CIO. Local 101 is located in Kansas City, Missouri, and is a member of the Missouri State Building and Construction Trades Council and the International Union of Operating Engineers. The Trades Council is a labor organization composed of representatives of various building and trades unions and councils, and is located in Jefferson City, Missouri. Elmer J. Cantrell was president of the Trades Council. Cantrell was also a member of the Missouri House of Representatives. The International is an international union comprised of local unions, and is headquartered in Washington, D.C.

In early 1985, Long approached the Director of the Department of Safety and Health for the International, A. Bennett Hill, Jr., requesting money to promote safety programs in Missouri. Long wanted to implement a cooperative labor-management safety program. Hill told Long that the Trades Council should apply for its own grant from OSHA. Hill received a copy of an application for an OSHA grant signed by Cantrell, and Hill understood that the Trades Council filed the grant application with OSHA, but that OSHA would not fund the program. There was evidence, however, that the Trades Council never filed the application with OSHA. Sometime later, Hill sent Long two $5,000 checks from

the International's OSHA grant funds as "seed money" for the Missouri program. The checks were payable to the "Missouri State Building Trades Safety Program."

Long delivered the checks to Edward E. Quick. Quick was a member of the Missouri Senate. Long asked Quick to be the director of the safety program. Cantrell and Quick opened a checking account under the name of "Missouri Building and Trades Council Safety Program," with themselves as signatories, and deposited the $10,000 received from the International in the account. In January 1986 Cantrell and Quick began writing themselves salary checks from the account. By the end of March 1986, the account had been reduced to a balance of approximately $557, which the two then divided between themselves. All told, Quick received approximately $6,500 of the $10,000 and Cantrell received approximately $3,500.

In late May 1986, OSHA audited the International's grant account and disallowed the $10,000 disbursement to the Trades Council. OSHA informed Hill that the money would have to be returned to the International's grant account. Hill told this to Long, and Long assured Hill that the money would be returned. Long stated that the Trades Council did not have the money, but that he would find a way to provide it. Long told Cantrell and Quick that the International needed the money returned. Long told Cantrell that Local 101 would reimburse the money.

In August 1985, a model of a crane and display boards had been prepared for a press conference following a fatal crane collapse on a construction project in Kansas City, Missouri. In the summer of 1987, Long sold these items to a safety consultant, Ernest Jorgensen, an owner and employee of Professional Safety Consultants, Inc., who did some work for the International. Jorgensen sent Long two checks from Professional Safety Consultants, one in the amount of $6,200 for the model and display boards, and another $3,800 check for additional materials consisting of photographs of the crane accident, miscellaneous news clippings, legal pleadings, and a copy

of a trade publication. These two checks were deposited in Local 101's bank account on July 16, 1987. On July 21, 1987, at Long's direction, Local 101 sent a $10,000 check to the Trades Council. The Trades Council deposited the $10,000 check into its general account, and at Cantrell's direction, sent a $10,000 check to the International.

This brief outline of events, which we will supplement as necessary in this opinion, led to the filing of a ten-count indictment against Long, Cantrell, and Quick. Count I charged all three defendants with conspiring to obtain $10,000 from the International for a safety program which was never implemented, in violation of 18 U.S.C. § 371. Counts III through VI charged all three defendants with receiving money unlawfully converted and taken by fraud from the International, in violation of 18 U.S.C. §§ 2, 2314, 2315, and unlawfully transporting checks in interstate commerce in violation of 18 U.S.C. §§ 2 and 2314. Count VII charged Cantrell with embezzling money from the Trades Council, and Quick and Long in aiding and abetting Cantrell in committing that offense, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2. Count VIII charged Long with embezzling assets of Local 101 (specifically, the model, display boards, carrying case, and file of photos and clippings), and Cantrell with aiding and abetting Long in committing that offense, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2.

The remaining counts of the indictment charged a separate conspiracy involving only Long and Cantrell. Count II charged Long and Cantrell with conspiring to embezzle $10,000 from Local 101 to reimburse the International's grant account, in violation of 18 U.S.C. § 371. Count IX charged Long with embezzling $10,000 from Local 101 and Cantrell with aiding and abetting Long in committing that offense, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2. Count X charged Cantrell with unlawfully transporting a $10,000 check, containing at least $5,000 of funds embezzled from the Trades Council and Long with aiding and abetting Cantrell in committing that offense, in violation of 18 U.S.C. §§ 2 and 2314.

A jury acquitted all three defendants of the charges relating to the first conspiracy (Counts I, III–VIII). The jury convicted Long and Cantrell on the charges relating to the second conspiracy. (Counts II, IX and X).

The district court granted Long and Cantrell's motion for an acquittal. *United States v. Long,* 757 F.Supp. 1038, 1046 (W.D.Mo.1990). The court also ruled that its failure to give two of defendants' instructions on the issue of multiple conspiracies constituted sufficient error to merit a new trial, but that the issue was moot because of the acquittals. *Id.* at 1046. This was, in effect, a conditional grant of defendants' motion for new trial should the acquittal be set aside on appeal. Fed. R.Crim.P. 29(d). The government appeals the order of acquittals and conditional grant of a new trial.

I.

The government argues that the district court erred by considering only the evidence relating to the counts on which Long and Cantrell were convicted in determining whether sufficient evidence existed to support the jury's convictions, and that sufficient evidence existed to support the convictions.

 The district court first considered the evidence relating to Count IX. Count IX charged that Long embezzled money from Local 101, a labor organization, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2.[1] Section 501(c) holds union officers criminally liable when they embezzle, steal, or unlawfully and willfully abstract or convert a union's funds to their own use or the use of others. *United States v.*

---

1. 29 U.S.C. § 501(c) provides:

 Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

*Welch,* 728 F.2d 1113, 1116 (8th Cir.1984). "To prove 'willfulness' under section 501(c), the government must show that the union officials possessed fraudulent or criminal intent to deprive the union of its funds." *Id.* Willfulness may be "proved by showing that defendant 'was sufficiently aware of the facts to know that he acted wrongfully and in contravention of the trust placed in him by the union and its members.'" *Id.* (quoting *United States v. Belt,* 574 F.2d 1234, 1238 (5th Cir.1978)).

This court in *United States v. Goad,* 490 F.2d 1158 (8th Cir.), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), held that the elements of a case under 29 U.S.C. § 501(c) are: "(1) fraudulent intent to deprive the union of its funds and (2) lack of authorization according to the union's constitution and bylaws." *Id.* at 1166 (footnote omitted). The district court here declined to follow *Goad,* concluding that lack of authorization was not an essential element of a 501(c) offense. 757 F.Supp. at 1042. The court reached this conclusion by relying on *Welch.* In *Welch,* we rejected the union's argument that the government may prove fraudulent intent under section 501(c) by showing that the conduct did not benefit the union, as intent could not be demonstrated "solely upon proof of an objective criterion." 728 F.2d at 1118. Thus, even though the district court concluded that union authorization or union benefit did not control the question of whether a section 501(c) violation occurred, the court considered those factors relevant to the issue of fraudulent intent. 757 F.Supp. at 1042–43.

The district court then considered whether sufficient evidence existed to establish fraudulent intent under section 501(c). The court found no dispute that Local 101 sent $10,000 to the Trades Council to reimburse the International, and that neither Long nor Cantrell received any portion of the $10,000 the Trades Council sent to the International. *Id.* at 1043. The court stated that although the $10,000 transaction may not have followed the precise duties required by Local 101's constitution and bylaws, the means of recording the transaction were the same as used for every Local 101 financial transaction. *Id.* at 1043–44. The court concluded that lack of compliance with the constitution and bylaws could not be used to infer fraudulent intent, as no evidence existed that Long attempted to hide the reimbursement or that the transaction differed from Local 101's usual means of effecting transactions. *Id.* at 1043–44.

The district court also ruled that fraudulent intent could not be inferred merely because Local 101 paid the money back to the International. *Id.* The court reasoned that although Local 101 had no legal obligation to reimburse the International, Local 101 did have a moral obligation to do so because Local 101, through Long, played a role in obtaining the funds from the International, and as a member of both groups, "had at least a moral interest in the reputation and well-being of both organizations." *Id.* at 1044. Based on these findings, the court concluded that there was insufficient evidence that Long possessed fraudulent intent in directing Local 101 to reimburse the International, and therefore, Long was entitled to judgment of acquittal on Count IX. *Id.*

The district court correctly stated the standard that governed its consideration of the sufficiency of the evidence. The same standard governs this court. The district court stated:

The defendant's conviction must be upheld if, after viewing the evidence in the light most favorable to the government, there is substantial evidence to support the jury's verdict. In reviewing the guilty verdict, we must give the government the benefit of all inferences that may be reasonably drawn from the evidence. The evidence need not exclude every reasonable hypothesis of innocence, but must simply be sufficient to convince the trier of fact beyond a reasonable doubt that the defendant is guilty. If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb a conviction. Moreover, the ... court must keep in mind that the standard to be applied to determine the sufficiency of the evidence

is a strict one, and the finding of guilt should not be overturned lightly.

*Id.* at 1041 (quoting *United States v. Schubel,* 912 F.2d 952, 955 (8th Cir.1990) (citations omitted)). *See also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■ The government first argues that the district court erred by failing to consider all of the evidence at trial. The government contends that in ordering acquittals on Counts II, IX, and X, the district court considered only the evidence relating to those counts, and did not consider the evidence relating to those counts in which the jury acquitted Long and Cantrell.

Long and Cantrell do not argue that the district court correctly considered only the evidence relating to the counts in which they were convicted. Instead, pointing to various statements the district court made, they say that it considered all of the evidence in ruling that insufficient evidence existed to prove fraudulent intent.

This court in dealing specifically with charges of converting union funds in violation of 29 U.S.C. § 501(c) and conspiring to violate that statute, made clear that the jury is to "determine fraudulent intent on the basis of 'all the evidence considered together' and in light of 'all the surrounding circumstances.'" *Welch,* 728 F.2d at 1119 (citing *Morissette v. United States,* 342 U.S. 246, 275–76, 72 S.Ct. 240, 255–56, 96 L.Ed. 288 (1951)). The Supreme Court also instructed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that the sufficiency of the evidence review involves assessment of *"all of the evidence."* *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original). In considering the sufficiency of evidence as to certain counts, this court recently considered evidence relating to counts on which a defendant was acquitted. *United States v. Liebo,* 923 F.2d 1308, 1311 (8th Cir.1991). In so ruling, we relied on *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), in which the Supreme Court observed that in assessing the sufficiency of evidence, we independently review "the jury's determination that evidence on an-

other count was insufficient." *Id.* at 67, 105 S.Ct. at 478. *Accord United States v. Alanis,* 945 F.2d 1032, 1035 (8th Cir.1991); *United States v. Reed,* 875 F.2d 107, 112 (7th Cir.1989); *United States v. Finkelstein,* 526 F.2d 517, 527 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

■ Based on the district court opinion before us, it is difficult to determine whether the district court, in concluding that insufficient evidence of fraudulent intent existed, considered all of the evidence adduced at trial or only the evidence relating to the counts in which the jury returned convictions. Nevertheless, even examining the evidence specifically relating to the charges of which Long and Cantrell were convicted, we are convinced that sufficient evidence existed to support the jury's finding of fraudulent intent.

Intent is an issue that turns in large part on the credibility and demeanor of witnesses, and is peculiarly within the province of the factfinder. *United States v. Reeves,* 730 F.2d 1189, 1195 (8th Cir.1984); *see also Welch,* 728 F.2d at 1119; *United States v. Singer,* 660 F.2d 1295, 1302 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982). The jury must determine the issue of intent from all the circumstances of the case because the element of knowledge is rarely capable of direct proof. *Reeves,* 730 F.2d at 1195. "Any uncertainty concerning the willful intent to commit the act is for the jury to resolve." *United States v. LeRoy,* 687 F.2d 610, 617 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

Applying these principles, we are satisfied that sufficient evidence existed to support the jury's finding of Long's fraudulent intent. We have already detailed Hills' demand to Long that the money be returned to the International, Long's response that he would find a way to provide it, his telling Cantrell and Quick of the demand, and his telling Cantrell that Local 101 would reimburse the money.

Long then sold the model crane and display boards to Jorgensen. On May 18,

1987, Jorgensen sent Long a $6,200 check payable to "Local Union 101—IUOE" for these items. On May 28, 1987, Long sent a letter to Hill telling him that he would be receiving a $10,000 check from the Trades Council within the next thirty days. Long later offered Jorgensen additional materials about the crane collapse consisting of a file of articles, photographs, and other miscellaneous materials. On July 9, 1987, Jorgensen sent Long a $3,800 check payable to "Local Union 101—IUOE" for these items. The letter accompanying the check stated the payment was for materials relating to the "Hyatt Regency disaster." However, no such materials were delivered to Jorgensen.

Both checks were deposited in Local 101's bank account on July 15, 1987. On July 21, 1987, Long directed Marie Plummer, Local 101's bookkeeper, to issue a $10,000 check to the "Missouri State Building Trades Safety Program." Long told Plummer that Local 101 would be reimbursed for the $10,000. Plummer recorded the check in Local 101's financial records as a "reimbursable expense." The check was signed by Long and a facsimile stamp was used for the signature of Local 101's treasurer, John Foster.

Donna Sanford, Cantrell's personal secretary and secretary for the Trades Council, testified that on July 22, 1987, she was given a $10,000 check from Local 101 for deposit, and at Cantrell's direction, she issued a $10,000 check to the International on July 24, 1987. Sanford asked Cantrell how to list the check on the financial report, and she recorded the transaction as a "special fund in" and "special fund out." Sanford also asked Trades Council's accountant how to record the transaction, and the accountant confirmed that she had properly recorded the transaction.

The Trades Council minutes reflect that Long attended a meeting of the Trades Council in Jefferson City, Missouri, on July 22, 1987, the same day that the Trades Council received the $10,000 check from Local 101. Cantrell chaired this meeting. Neither Long nor Cantrell disclosed to the Trades Council that the International was demanding repayment of the $10,000 it sent to the Trades Council, that the Trades Council had received $10,000 from Local 101, or that the Trades Council was going to send $10,000 to the International.

Local 101's bylaws state that the powers and duties of the officers are defined in the Constitution of the International. The duties of the treasurer include receiving and holding all funds collected by the financial secretary, giving receipts for such funds collected, and reporting on the financial condition and transactions of the union. The constitution prohibits the treasurer from disbursing union funds without the local union's approval and only upon the order of the president and recording secretary.

In addition, the constitution requires that the treasurer and president co-sign all checks, that the recording secretary sign all orders on the treasurer for checks, and that the financial secretary keep an accounting of all union finances. The constitution also provides that the trustees supervise the funds and properties of the union. John Foster, Local 101's treasurer, testified that he did not know that Local 101 received $10,000 from Jorgensen, or that Local 101 had sold the model crane or display boards. Foster also testified that he did not authorize or know that Local 101 sent $10,000 to the Trades Council, or of any obligation requiring Local 101 to send $10,000 to the Trades Council. Shaw, Local 101's financial secretary, testified that he did not know of any obligation or reason requiring Local 101 to send $10,000 to the Trades Council.[2] Roger Kaminska, a trust-

---

**2.** Shaw also admitted that "it would have been an impossibility" to report every receipt and expenditure to the Executive Board and membership. From this, Long argues that Shaw's testimony shows that the expenditure to the Trades Council was reflected according to Local 101's custom and practice and not evidence of fraudulent intent. Shaw, however, clarified this statement by agreeing that Local 101's sending of $10,000 to the Trades Council was an "unusual item." There was evidence that other non-recurring transactions such as the use of funds for political contributions, advertising, charitable donations, and acceptance of an offer

ee of Local 101, testified that he did not authorize or know that Long sold the model crane, display boards, or other items to Jorgensen.

Shaw testified about the procedures Local 101 used to report income and approve expenditures. He stated that he prepares a monthly financial report from the bookkeeper's information listing income and expenditures and submits the report to the Executive Board. The Executive Board then votes on whether to approve the payment of bills, and its action is recorded in the Executive Board minutes. The Executive Board minutes are then read to the general membership at the regular union meeting, and the general membership votes on whether to approve the Executive Board minutes. The checks from Jorgensen to Local 101 and the $10,000 check from Local 101 to the Trades Council were not reflected on Local 101's monthly financial report or in the Executive Board or union meeting minutes.

Long argues that the district court correctly concluded that the government failed to prove fraudulent intent. Long points to the following circumstances which he asserts conclusively establish a lack of fraudulent intent: (1) compliance with Local 101's customs and practices; (2) Local 101's documentation of the transactions; and (3) Local 101's obligation to reimburse the International. Long also points to the statements of Louie Wright, a labor union consultant, in an offer of proof, that Long's actions were authorized by the language and history of Local 101's constitution, and by Local 101's custom and practice.

■ It is true, as Long vigorously argues, that there was substantial evidence that Long complied with the custom and practice of Local 101 in recording the receipt of the $10,000 from Jorgensen, disbursing the $10,000 to the International, and reporting such information to the Executive Board and membership. For example, Foster (Local 101's treasurer) explained that he did not receive the monies

on a sale of property, were discussed and voted on in Executive Board meetings and general

for Local 101 or review the list of monies received, deposits made, or checks issued by the union, and that his signature stamp was often used to sign checks, despite the contrary requirements set forth in the constitution. There was also evidence explaining that Local 101's receipt of $10,000 from Jorgensen and issuance of $10,000 check to the Trades Council were reflected in underlying cash receipts and disbursement journals, check registers, and bank deposit slips, but were not reflected in the summarized financial reports because the transactions were a "wash."

Nevertheless, in light of the evidence recounted above, that the transactions in question were recorded consistently with Local 101's custom and practice does not in and of itself negate a jury finding of fraudulent intent. There was evidence that Long did not inform the union members about selling the model, display boards, and other items to Jorgensen for $10,000 and using the proceeds to reimburse the International, and that as president of the union, he was obligated to do so. From this evidence, a jury could reasonably infer that Long wrongfully, and in contravention of the trust placed in him by the union members, abstracted funds from Local 101. Moreover, the evidence that Long told Plummer the $10,000 Local 101 paid to the Trades Council was "reimbursable" makes the recording of the transaction suspect, and in itself creates evidence from which the jury could have inferred Long's intent to conceal the transaction from the union. The jury could reasonably have inferred that the $10,000 payment to the Trades Council was not "reimbursable," but rather, Local 101's sale of union assets to Jorgensen and a transfer of the sale proceeds to the Trades Council.

Long relies on *United States v. Hart,* 417 F.Supp. 1314 (S.D. Iowa 1976), to support his position that his actions were authorized, and thus, he acted without the requisite fraudulent intent to violate section 501(c). In *Hart,* the government

meetings.

charged the president of a union with violating section 501(c) because he paid the legal fees and fines incurred by certain union members. *Id.* at 1315. The district court, after a bench trial, acquitted Hart holding that the government failed to prove fraudulent intent. In so ruling, the court found the following circumstances persuasive:

> All payments which are the subject of the indictment were openly and properly recorded in the union's ledger books. General discussions were had at board meetings regarding the pending criminal cases, and on one such occasion specific cases were discussed by the defendant. Whenever he was asked, the defendant fully answered any questions regarding the payments. There is simply no basis from which an intent to conceal facts from the union or deceive its members can be inferred.

*Id.* at 1322 (citation omitted).

Here, in contrast to the circumstances outlined in *Hart,* it is undisputed that Long never discussed with the union board, officers, or members the transactions in question. Moreover, *Hart* was tried before a district court judge, and the quoted passage does not deal with a jury finding of fraudulent intent. *Hart,* thus, is of no help to Long.

■ We also cannot conclude that Local 101's "moral obligation" to reimburse the International can necessarily negate the jury's finding of fraudulent intent. From the evidence outlined above, the jury could have reasonably inferred that Local 101 had no obligation to reimburse the International, and thus, the jury finding must stand. *See Schubel,* 912 F.2d at 955.

Facts that were more material to the counts of which Long and Cantrell were acquitted give further support to our conclusion that there was sufficient evidence for a jury to conclude that Long possessed the requisite fraudulent intent to deprive the union of its funds in violation of section 501(c). Long obtained $10,000 from the International and passed the money on to Cantrell for the safety program. The Trades Council minutes report only that

Cantrell mentioned the possibility of getting an OSHA grant to initiate a safety program and that Cantrell was authorized to look into the matter and, if successful, proceed to initiate a program. Besides this brief mention, the minutes reflect nothing more about a safety program. Cantrell did not tell the Trades Council board or membership that the Trades Council received $10,000 from the International for a safety program, that a separate account had been opened with himself and Quick as signatories, or that the account had been depleted by salary expenditures to himself and Quick. Cantrell did not report on any activity associated with the safety program. Walter Roseburrough, a trustee, and three members of the Executive Board all testified that they were not aware of anything about a safety program beyond the minute reference in the council minutes.

The evidence about the work Cantrell and Quick performed for their "salaries" from the safety program monies also raises an inference of fraudulent activity. Cantrell claimed to have worked weekends and nights in January 1986 on a computer list of contractors which he gave to Quick. Quick claimed to have phoned four or five of the contractors, but he could not recall any of the contractors' names. There was evidence which indicated that the contractor list Cantrell allegedly compiled had been prepared by clerical staff and paid for by the Trades Council in their effort to keep abreast of identifying union contractors. Cantrell's Mastercard records reflected that he was not in Jefferson City, Missouri, during much of the time that he claimed to have been preparing or updating the list. Ellis, the secretary-treasurer for the Trades Council, who is required to co-sign all checks and make financial reports for the Trades Council, testified that he was unaware of a safety program, the existence of a separate bank account, the receipt of the two $5,000 checks used to open the account, or how the funds were spent. A number of representatives from the Missouri Builders Association testified about their interest in construction safety. They all testified that they knew or knew

of Cantrell, Quick, and Long, and that they had not been contacted about a safety program and were unaware of the existence of the Trades Council safety program.

From this evidence, the jury could reasonably question the propriety of the $10,000 in disbursements to Cantrell and Quick. Long had a hand in obtaining the $10,000 from the International, told the International that the money would be reimbursed, and told Cantrell that Local 101 would reimburse the International. This evidence, coupled with that we have discussed above, further supports the jury's finding of fraudulent intent.[3] Accordingly, we reverse the district court's order of acquittal of Long on Count IX.

## II.

The district court also acquitted Cantrell on Count IX. 757 F.Supp. at 1044. The court concluded that Cantrell could not be guilty of aiding and abetting Long of violating section 501(c) when insufficient evidence existed that Long possessed the requisite fraudulent intent to violate section 501(c). *Id.* The court further stated that there was no evidence that Cantrell: (1) knew anything more than that Long was attempting to acquire funds to reimburse the International; or (2) knew how Long would obtain the funds. *Id.* at 1044. The court concluded that Cantrell did not " 'associate himself with the venture,' " and thus, could not be found guilty of aiding and abetting Long in violating section 501(c). *Id.* (citing *United States v. Lard,* 734 F.2d 1290, 1298 (8th Cir.1984)).

Cantrell argues that he cannot be found guilty of aiding and abetting Long in violating section 501(c) because: (1) Long had no fraudulent intent; and (2) Cantrell did not participate in the alleged embezzlement from Local 101 or know anything about the means of how the money would be reimbursed.

■ We reject Cantrell's first argument in light of our holding in Part I, *supra.*

We also reject Cantrell's second argument because we are satisfied that sufficient evidence existed that Cantrell shared in Long's criminal intent. *Lard,* 734 F.2d at 1298 (to be guilty of aiding and abetting defendant must share in the principal's essential criminal intent). Cantrell received approximately $3,500 of the $10,000 received from the International. Cantrell knew that the International demanded the return of the $10,000, and that Local 101 would reimburse the $10,000 to the International. Cantrell knew that Local 101 sent $10,000 to the Trades Council for the purpose of reimbursing the International. Although Cantrell may not have known the exact means Long used to obtain the funds from Local 101, as discussed, evidence existed from which the jury could have reasonably inferred that Local 101 had no obligation to reimburse the International for the safety program, and thus, that Long wrongfully obtained the funds from Local 101.

Moreover, from the evidence that Local 101 officers (other than Long) did not know that Local 101 sent $10,000 to the International, did not authorize the expenditure, did not know about the safety program, and did not know about the need to reimburse the International, the jury could infer that the funds were wrongfully obtained from Local 101. The $10,000 check from Local 101 went into the Trades Council account and, pursuant to Cantrell's direction, was sent to the International without the knowledge of the officers or members of the Trades Council. As discussed, there was evidence that members of the Trades Council's executive board did not know about the existence of the safety program, the receipt of $10,000 from the International, that Cantrell and Quick opened a separate account, and depleted the account by making disbursements to themselves.

From this evidence, the jury could infer that Cantrell shared in Long's criminal in-

**3.** Long also argues that he acted in good faith, and thus, could not be found guilty of violating section 501(c). The court instructed the jury, however, that good faith was a complete defense to all charges, and the jury rejected this defense. In light of the evidence outlined, we reject Long's argument.

tent, and thus, the district court erred in ordering Cantrell's acquittal on Count IX.

### III.

■ The district court also concluded that there was insufficient evidence to support either Long or Cantrell's convictions on Count X. Count X charged that Long and Cantrell caused the Trades Council check to move in interstate commerce, knowing that the check had been stolen, converted, or taken by fraud. The court ruled that the evidence established only that Long sent a check from Local 101 to the Trades Council for the sole purpose of the Trades Council's sending the funds on to the International. 757 F.Supp. at 1440. The court observed that the government failed to prove the Trades Council's check was stolen as the deposit of the funds from Local 101 in the Trades Council's account did not make those funds the property of the Trades Council. *Id.* We believe it is for the jury to determine whether a check payable to the Trades Council, deposited in its account, constitutes property of the Trades Council. The district court preempted the jury's responsibility in making this finding of fact.

As discussed in Part I and II, *supra,* we believe sufficient evidence existed from which the jury could have inferred that the funds from Local 101 were "stolen, converted, or taken by fraud." It is undisputed that the funds from Local 101 were passed on to the Trades Council and to the International. Thus, sufficient evidence existed to support the jury's finding of guilt on Count X, and the district court erred in ordering acquittals for Long and Cantrell on Count X.

### IV.

The district court also ruled that there was insufficient evidence to support Long or Cantrell's convictions on Count II for conspiring to embezzle funds from a union.[4] The court ordered acquittals because it concluded that no evidence of an agreement to commit an illegal act existed. 757 F.Supp. at 1044–45 (citing *United States v. Peyro,* 786 F.2d 826, 829 (8th Cir.1986)). The court observed that Long and Cantrell agreed only to reimburse the International for the $10,000 provided from the International's grant account, and that such a reimbursement did not amount to an illegal act. 757 F.Supp. at 1044–45. The court reasoned that even assuming that the means by which Long intended to obtain the funds was illegal, there was no evidence from which it could be inferred that Cantrell agreed to or knew how Long would obtain the money. *Id.* at 1045.

■ Cantrell and Long argue that the government's basis for sustaining their convictions on this count is based purely on circumstantial evidence, and that to sustain a conviction on purely circumstantial evidence, such evidence must not only be consistent with the defendant's guilt, but must also be inconsistent with innocence. *Cartello v. United States,* 93 F.2d 412, 414–15 (8th Cir.1937). Long and Cantrell· argue that since there was no direct evidence of a conspiratorial agreement and because the circumstantial evidence was consistent with innocence, the court correctly ordered acquittals on Count X.

Because a conspiratorial agreement is usually clandestine, it is frequently incapable of proof by direct evidence. *See United States v. Raymond,* 793 F.2d 928, 932 (8th Cir.1986) (circumstantial evidence giving rise to a strong inference of agreement between participants is sufficient to establish a conspiracy). We held in *United States v. Jacobson,* 536 F.2d 793 (8th Cir.), *cert. denied,* 429 U.S. 864, 97 S.Ct. 171, 50 L.Ed.2d 144 (1976), that "circumstantial evidence does not fail simply because it may

4. Long and Cantrell also argue that the Trades Council is not a "labor organization" for purposes of a violation of 29 U.S.C. § 501(c). Long and Cantrell raised this issue during trial. The district court stated that it appeared that the Trades Council is a "labor organization," as defined in 29 U.S.C. § 402(i) or (j), but that the issue was a "legal question dependent on a wide array of factual characteristics of the [Trades Council]." *United States v. Long* (W.D.Mo. 1990). Count II charges the agreement to embezzle funds from Local 101 and not from the Trades Council, thus, the status of the Trades Council as a labor union is not critical.

infer innocence as well as guilt." *Id.* at 796 (citing *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954)).

■ We are persuaded that the totality of the evidence supports the jury's finding that a conspiratorial agreement to embezzle money from Local 101 existed. Long told Cantrell that the International must be reimbursed the $10,000 the Trades Council received for the safety program. Cantrell received $3,500 as salary from the safety program in a period of less than three months, and there is little to establish what Cantrell did to earn this salary. Long told Cantrell that Local 101 would reimburse the International. If the International required the money to be reimbursed and Local 101 did not do so, then a jury could reasonably infer that the International would call on the Trades Council to reimburse the money. The membership of the Trades Council, other than Cantrell, knew nothing about the existence of the safety program, the existence of the separate bank account, or the depletion of the account by salary disbursements to Quick and Cantrell. A jury could reasonably infer that Cantrell had an interest in not paying back the money personally, and that Long did not wish for him to do so. This inference would allow a jury to conclude that Long and Cantrell agreed to obtain the funds from Local 101. Moreover, the sale of the Local 101 property for $10,000, and the transfer of the $10,000 to the Trades Council also evidence an agreement to embezzle money from Local 101.

Sufficient evidence existed to support the jury's convictions on Count X, and thus, the district court erred in ordering acquittals on this count.

**V.**

Finally, the government argues that the district court erred in concluding that its failure to instruct the jury on the issue of single versus multiple conspiracies constituted a sufficient error to merit a new trial. 757 F.Supp. at 1046. Although holding the issue moot because of its order of acquittals, the district court concluded that a "reasonable argument" existed that it had erred in refusing to submit two instructions (17 and 45) offered by the defendants to the jury, and that a new trial was warranted. *Id.* at 1045.

The question of whether one or two conspiracies exists is a jury question. *United States v. Zimmerman,* 832 F.2d 454, 457 (8th Cir.1987). Long and Cantrell argue that there was only one conspiracy, and that the court erred in refusing to instruct the jury on the issue of one versus two conspiracies. They argue that the second conspiracy count (Count II) alleged a conspiracy to conceal the acts alleged in the first conspiracy count (Count I), and so, the two counts were multiplicitous. Finally, they assert that because they were acquitted on the first conspiracy, they must be acquitted on the second conspiracy.

The government argues that the district court erred in conditionally granting a new trial because the instructions Long and Cantrell offered (Instructions 17 and 45) did not submit the issue of a single versus multiple conspiracies.

■ Instruction 17[5] offered by defendants directed the jurors to: determine whether the conspiracy charge existed; identify the members of the conspiracy; and acquit any defendant not a member of the conspiracy. The district court covered the substance of this instruction by other instructions, (Inst. 15, 16, 17, and 19), and

---

**5.** The instruction provided:

Proof of several separate conspiracies is not proof of the single, over all conspiracy charged in the indictment unless one of the several conspiracies which is proved is a single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you

must acquit. However, if you are satisfied that such a conspiracy existed, you must determine who are members of that conspiracy.

If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy.

thus, did not abuse its discretion in refusing the defendants' proposed instruction. *United States v. Brown,* 584 F.2d 252, 259 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).

Instruction 45 read: "If you find the government has failed to prove the existence of only one conspiracy, you must find the Defendants not guilty." This instruction does not raise the issue of a single versus multiple conspiracies.

■■■ Long and Cantrell cite nothing in the instruction conference transcript showing that they requested an instruction on the issue of one versus two or more conspiracies. Nevertheless, the defense did raise the issue in a pre-trial motion to dismiss, and in any event, we are satisfied that the district court did not err in failing to charge the jury because the indictment and proof at trial consisted of two separate conspiracies. When the evidence does not support the giving of a multiple conspiracy instruction, the failure to do so is not error. *United States v. Davis,* 882 F.2d 1334, 1341–42 (8th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990).

In determining whether there is one conspiracy or two, the crucial concern "is the scope of the conspiratorial agreement, for it is that which determines ... the duration of the conspiracy." *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957). In *Grunewald,* the defendants obtained "no prosecution" rulings from the IRS by bribing IRS officials. *Id.* at 394–95, 77 S.Ct. at 968–69. Subsequent activities of the conspirators were directed at concealing the irregularities in obtaining these rulings. *Id.* at 395, 77 S.Ct. at 969. The Supreme Court concluded that subsequent concealment activities did not extend the conspiracy directed at obtaining the rulings, so as to bring those earlier activities within the statute of limitations period. *Id.* at 405, 77 S.Ct. at 974.

In so ruling, the Supreme Court stated:

By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime. Thus the Government argues in its brief that "in the crime of kidnapping, the acts of conspirators in hiding while waiting for ransom would clearly be planned acts of concealment which would be in aid of the conspiracy to kidnap. So here, there can be no doubt that ... all acts of concealment, whether to hide the identity of the conspirators or the action theretofore taken, were unquestionably in furtherance of the initial conspiracy ..." We do not think the analogy is valid. Kidnappers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; in both cases, the successful accomplishment of the crime necessitates concealment. More closely analogous to our case would be conspiring kidnappers who cover their traces after the main conspiracy is finally ended—i.e., after they have abandoned the kidnapped person and then take care to escape detection. In the latter case, as here, the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord.

*Id.* at 405–06, 77 S.Ct. at 974 (footnote omitted).

■■■ In determining whether one or two conspiracies exist for purposes of determining whether double jeopardy bars a prosecution, the two conspiracies are examined by comparing the: (1) time; (2) persons acting as co-conspirators; (3) offenses charged; (4) overt acts; and (5) loci of the conspiracies. *United States v. Thomas,* 759 F.2d 659, 662 (8th Cir.1985) (subsequent history omitted).

Applying these principles, we are convinced that the district court did not err in failing to charge the jury on the issue of one versus multiple conspiracies. The evidence conclusively established two separate conspiracies. The first conspiracy (Count I) involved Long, Cantrell, and Quick's obtaining money from the International and using those funds. The second conspiracy arose only after OSHA audited the International's grant account. The mere fact that the second conspiracy may have been motivated by a desire to conceal the first conspiracy does not in and of itself convert the two conspiracies into one. *Grunewald*, 353 U.S. at 402, 77 S.Ct. at 972–73 ("Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.") Here, the two conspiracies were separated by time, and involved only two of the three same individuals. Although the statutory offenses charged were the same, the overt acts were different—Count I involved Long, Cantrell, and Quick obtaining funds from the International to set up a safety program, and Count II involved Long and Cantrell obtaining funds from Local 101 to reimburse the International. The underlying activities of both alleged conspiracies involved separate objectives and agreements. Accordingly, the district court erred in conditionally ordering a new trial.

We reverse and remand the case to the district court to enter judgments of convictions, and to proceed to sentence Long and Cantrell.