UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerome RAY, Defendant–Appellant.

No. 94–1391.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1994.

Decided Sept. 13, 1994.

Bruce Simon, Kansas City, MO, argued, for appellant.

Christina Tabor, Kansas City, MO, argued (Stephen L. Hill, Jr. and Christina Y. Tabor, on the brief), for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MELLOY *, Chief District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Jerome Ray appeals from his conviction and sentence for conspiring to sell cocaine, 21 U.S.C. §§ 841 and 846 (1988 and Supp. V 1993); for aiding and abetting the distribution of cocaine base, 21 U.S.C. § 841 and 18 U.S.C. § 2 (1988); and for use of a firearm in drug trafficking, 18 U.S.C. § 924(c)(1) (Supp. V 1993). He was sentenced to 151 months on each of the drug counts, to run concurrently, and 60 months on the firearm charge, to run consecutively. He argues that there was insufficient evidence to convict him of conspiracy to sell cocaine, and that the court should have reduced his sentence because he played only a minor or minimal role in the crimes. We conclude there is ample evidence to uphold the judgment and sentence of the district court,[1] and therefore we affirm.

The most substantial evidence against Ray on the conspiracy charge came from the government's undercover agent, Cooper, and from two co-conspirators, Brown and Williams.

Cooper told how he had started buying small amounts (one ounce) of "crack" cocaine from Brown and Williams in Kansas City, Kansas. Cooper had initially contacted Brown, but Williams showed up with Brown to consummate each transaction. After two

---

* The HONORABLE MICHAEL J. MELLOY, Chief United States District Judge for the Northern District of Iowa, sitting by designation.

1. The Honorable Scott O. Wright, Senior United States District Judge for the Western District of Missouri.

purchases, Cooper decided to escalate to a larger amount. He asked Williams for a quarter kilogram of crack, but Williams said he needed time to locate a source. Brown later paged Cooper and quoted him prices of $7,000 for one-quarter kilogram, and $12,500 for one-half kilo. Within a day of this quote, Cooper and Brown agreed on a proposed one-quarter kilo sale to take place in Kansas City, Kansas on June 11, 1993. However, the deal was aborted when Cooper showed up at the rendezvous and Brown reported that he was still trying to make contact with his source.

Cooper pursued the matter two days later, paging Brown and asking to pick up the quarter kilo the next day, June 14. On June 14, the two negotiated a quarter kilo sale for $7,500 to take place that day. Cooper proposed Gates Barbecue restaurant in Kansas City, Kansas, as the spot for the transaction, but Brown specified the Gates restaurant at 47th and Paseo in Kansas City, Missouri.

Cooper showed up at the appointed time and place and telephoned Brown from his car phone. Brown and Williams arrived in a Blazer and parked next to Cooper. Williams proposed going to his mother's house nearby to pick up the package, but Cooper insisted on completing the deal there in the Gates parking lot. Williams had to negotiate this point with a third party, so he got in Cooper's car to use Cooper's mobile telephone. He made two telephone calls to someone he called "Flash," telling "Flash" that he had seen Cooper's money and imploring "Flash" to come to Gates and complete the deal. Williams later testified that he called Ray "Flash." After the second call, Williams told Cooper the package would be coming.

While Cooper and Williams were waiting in Cooper's car, Brown came over and said that "Jerome" was now in the back seat of Williams' Blazer. Evidence from government surveillance agents supports the inference that Ray had walked to the Gates parking lot from another parking lot two buildings south of there, where he had been sitting in a brown Chevrolet. Cooper got in the back seat of the Blazer with Ray to negotiate. Ray was still recalcitrant about delivering the cocaine in the Gates parking lot. Ray said he had told Williams on the phone that the Gates parking lot was "not the safest place in town to do the deal," and that people had been busted in this parking lot. Cooper was adamant about doing the deal at Gates, and Ray finally relented. Ray said his people were parked two buildings from Gates. He asked to use Cooper's phone to call his people, and after he had done so, he walked away. Within five minutes, a brown Chevrolet arrived in the parking lot with Ray in the back seat. The two men in the front seat of the Chevrolet were later identified as Langston and Michael Williams.

After visiting the Chevrolet, Williams came to Cooper and told him that the cocaine was there. Cooper got in the front seat of the Chevrolet. The driver of the car, Langston, handed Cooper a package, saying "It's 250," meaning that it contained 250 grams of cocaine. In the package was a big, solid piece of cocaine. Cooper then gave the arrest signal and police arrested everyone involved.

Police found a handgun in the back seat of the Chevrolet where Ray was sitting before his arrest.

Brown's and Williams' testimony shed even more light on Ray's role in the drug supply chain. Brown testified that when Cooper approached him, asking to buy the ounce quantities of cocaine, Brown contacted Williams, who supplied the drug. When Cooper asked for a larger amount, Williams called on Ray, who could supply the larger amount. Ray said he first had to obtain the cocaine from someone else. Ray also said that his source would not go to the Kansas City, Kansas, location first proposed, but would insist on a Missouri location. Williams said that the arrangement between Brown, Ray and himself was that they would split $500 of the proceeds from the sale, with the rest presumably going to the suppliers, Langston and Michael Williams.

In light of all this evidence, Ray's contention that there was insufficient evidence to prove he participated in a conspiracy is frivolous. Under the familiar standard for sufficiency of evidence, we must review the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Long*, 952 F.2d 1520, 1524–25 (8th Cir.

1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992).

Ray argues that his conviction of conspiracy rested entirely on his mere presence at the scene of the sale. On the contrary, there is evidence that he located the drug source; coordinated the meeting of Brown, Williams, Cooper, Langston, and Michael Williams; negotiated the final rendezvous place with Cooper; and agreed beforehand on the allocation of profits between himself, Williams, and Brown. Ray's attempt to paint himself as a bystander is at war with an extensive record showing him as a key player in the conspiracy. We reject this argument.

■ Likewise, Ray's argument that he should have been sentenced as a minor or minimal participant under U.S.S.G. § 3B1.2 (1993) is utterly meritless. The district court's determination that Ray was not entitled to a reduction in his sentence for minor or minimal role in the crime is reviewed only for clear error. *United States v. Rayner,* 2 F.3d 286, 288 (8th Cir.1993). Given the evidence we have just recited, no clear error appears.

We affirm the conviction and sentence.